STITT SPARK PLUG CO.,
Plaintiff–Appellant,

v.

CHAMPION SPARK PLUG CO.,
Defendant-Appellee.

No. 87–2656.

United States Court of Appeals,
Fifth Circuit.

April 1, 1988.

Rehearing and Rehearing En Banc
Denied May 9, 1988.

Wayne H. Paris, Houston, Tex., for plaintiff-appellant.

Donald F. Melhorn, Jr., Toledo, Ohio, N.K. Alexander, Jr., Rufus W. Oliver, III, Houston, Tex., for defendant-appellee.

Before BROWN, JOHNSON and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Stitt Spark Plug Company brought this antitrust suit against Champion Spark Plug Company alleging that Champion engaged in anticompetitive practices, including price discrimination, predatory pricing and exclusive dealing, violative of the Sherman and Robinson–Patman Acts. The district court entered a directed verdict for Champion after Stitt presented its evidence to the jury. We find that Stitt's theory of predatory pricing is implausible and that a reasonable jury could not have concluded that any exclusive dealing agreements with dealers denied Stitt access to the market for industrial spark plugs. We affirm.

I

Champion Spark Plug Company is the leading independent manufacturer of spark plugs, and sells at least three hundred different models of plugs, many of which can be used in a variety of different engines. Champion's plugs fall into three broad categories: "industrial" plugs, for use in large, stationary engines; "commercial" plugs, for automotive and smaller engines; and "dual" plugs, which can be used in either industrial or commercial engines. Stitt Spark Plug Company, a smaller manufacturer, makes over two hundred different models, nearly all of which fall into the "industrial" category.

Both companies sell their spark plugs to two distinct kinds of purchasers. One group of buyers consists of companies that manufacture engines in which spark plugs are included as original equipment. The other group consists of warehouse distributors and retail part stores that purchase spark plugs for resale to engine owners as replacement equipment. The two "markets" are related, however, in that engine owners tend to purchase replacement plugs

of the same brand as the plugs that came with the engine originally. Stitt's witnesses provided at least three explanations for this preference: (1) engine operators have confidence in the original brand of plug because it performed well; (2) operators trust that the engine manufacturer selected the original brand because it was well suited for the engine; and (3) operators fear that use of a different brand will endanger the engine's warranty.

In order to capitalize on this consumer preference, Champion sells spark plugs to original equipment manufacturers at prices well below the price of replacement plugs, even though the products are otherwise identical. Stitt brought this lawsuit alleging that Champion's pricing policy was predatory and in violation of the antitrust laws. The suit also alleged that Champion was guilty of price discrimination and exclusive dealing. After Stitt presented its evidence to a jury, the district court issued a directed verdict for Champion on all counts.

## II

Stitt accused Champion of three kinds of anticompetitive conduct: predatory pricing under Sherman Act § 2 and Clayton Act § 2(a); price-discrimination under Clayton Act § 2(a); and exclusive dealing under Sherman Act § 1 and Clayton Act § 3. We deal with each allegation in turn, keeping in mind that the district court should have granted a directed verdict only if reasonable people could not arrive at a verdict against Champion after considering all the evidence and all reasonable inferences that can be drawn from it in a light most favorable to Stitt's case.[1]

1. *See Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969).

2. 15 U.S.C. § 2.

3. 15 U.S.C. § 13(a).

4. *See Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 853 n. 16 (5th Cir.), *cert. denied,* 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981).

## A

Stitt first argues that Champion sold spark plugs in the original-equipment market at prices below cost in order to eliminate Stitt as a competitor in the replacement market. This conduct, according to Stitt, was an illegal attempt to monopolize within the meaning of Sherman Act § 2[2] as well as unlawful price discrimination in violation of Clayton Act § 2(a).[3] Because we use a similar standard for judging assertions of predatory pricing under these statutes,[4] we discuss the claims together.

The Supreme Court recently discussed predatory pricing in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*[5] *Matsushita* considered the claim of American television manufacturers that a group of Japanese competitors conspired to lower the price of television sets in order to drive American manufacturers out of business. In holding that the district court properly dismissed the case on summary judgment, the Court noted that plaintiff's burden was to "come forward with 'specific facts showing that there is a *genuine issue for trial,*'"[6] that is, one that is economically plausible in light of the evidence presented. "[I]f the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary [to avoid summary judgment]."[7] The Court went on to hold that the economic disincentives to predatory pricing often will justify a presumption that an allegation of such behavior is implausible.

[T]he success of [predatory pricing] schemes is inherently uncertain: the short-run loss is definite, but the long-

5. 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Cargill, Inc. v. Monfort of Colorado, Inc.,* — U.S. ——, 107 S.Ct. 484, 493–94, 93 L.Ed.2d 427 (1986) (discussing predatory pricing).

6. *Matsushita,* 106 S.Ct. at 1356 (emphasis in opinion) (quoting Fed.R.Civ.P. 56(e)).

7. *Matsushita,* 106 S.Ct. at 1356.

run gain depends on successfully neutralizing the competition. Moreover, it is not enough simply to achieve monopoly power, as monopoly pricing may breed quick entry by new competitors eager to share in the excess profits. The success of any predatory scheme depends on *maintaining* monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain. Absent some assurance that the hoped-for monopoly will materialize, *and* that it can be sustained for a significant period of time, "[t]he predator must make a substantial investment with no assurance that it will pay off." Easterbrook, Predatory Strategies and Counterstrategies, 48 U.Chi.L.Rev. 263, 268 (1981). For this reason, there is a consensus among commentators that predatory pricing schemes are rarely tried, and even more rarely successful.[8]

As the Court recognized, predatory pricing can be anticompetitive if it contributes to monopoly power; the successful predator eliminates its competitors in order to raise prices above competitive levels at a later time.[9] Stitt's theory here is different: Champion is accused of cutting prices in one market—original equipment—in order to capture concurrent gains in another market—replacement equipment. It is central to Stitt's theory that purchasers of replacement spark plugs prefer the same brand that came with the equipment when new.[10]

Premised on this theory, Stitt's evidence could not support an economically plausible inference that Champion's policy was aimed ultimately at raising prices above competitive levels. Under Stitt's theory that a sale to an original-equipment manufacturer assures sales to the replacement market, an inquiry into competitive effect must look at the original and replacement markets together. When Champion sets the prices for original-equipment plugs, the expected return includes not only the price paid by the original-equipment manufacturer, but also the replacement purchases that probably will follow. Hence, any meaningful comparison of price and cost must encompass Champion's sales to both markets.[11] Stitt's evidence did not demonstrate that Champion's practices were "predatory" across both markets.

Looking at it another way, Stitt never proved that Champion's recoupment of losses on below-cost sales depended upon the absence of Stitt as a competitor. No action of Champion prevented Stitt from also pricing its product to original-equipment manufacturers with an expectation of return from the replacement market. Stitt's own witnesses testified that the consumer preference can be captured by *any* manufacturer who can place its plugs with engine makers.[12] Hence, any ability Champion may have had to raise prices for replacement plugs was not the result of market power. Without an economically plausible theory of anticompetitive effect, Stitt was not entitled to reach the jury on the predatory-pricing claim.

### B

Stitt also alleged that Champion engaged in two kinds of illegal price-discrimi-

---

**8.** *Id.* at 1357–58.

**9.** *See Adjusters Replace–A–Car, Inc. v. Agency Rent–A–Car, Inc.,* 735 F.2d 884, 889 (5th Cir. 1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985); *International Air Industries, Inc. v. American Excelsior Co.,* 517 F.2d 714, 723 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976).

**10.** The phenomenon that consumers prefer the original plug for replacement is not new to antitrust law. *See Ford Motor Co. v. United States,* 405 U.S. 562, 565, 92 S.Ct. 1142, 1145, 31 L.Ed.2d 492 (1972) (discussing "OE tie" in automotive spark plugs).

**11.** *Cf. Bayou Bottling, Inc. v. Dr. Pepper Co.,* 725 F.2d 300, 305 (5th Cir.) (stating that predatory-pricing analysis must include entire product line), *cert. denied,* 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984).

**12.** Counsel for Stitt retreated from this admission at oral argument, contending for the first time that consumers tended to use Champion plugs for replacement purposes because Champion's exclusive-dealing practices made other brands unavailable. Such a theory is inconsistent with the essence of the predatory-pricing claim: if Champion so dominated the replacement market, it would not need to sell below cost in the original equipment market.

nation: Champion charged different prices in the markets for original and replacement equipment, as we discussed, and Champion varied its prices between different warehouse distributors of replacement plugs. Stitt contended that these practices constituted an attempt to monopolize in violation of Sherman Act § 2. Stitt also complained that this discrimination violated the Robinson–Patman Act, which prohibits either direct or indirect "discrimination in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce...." [13]

We explained in *International Air v. American Excelsior Co.*,[14] that when a company claims that its competitor engaged in price discrimination—a "primary-line" claim—injury to competition is not established by evidence of "a mere diversion of business from one competitor to another." [15] In *International Air*, we affirmed entry of a directed verdict against a manufacturer of cooling pads who sued a competitor alleging that the competitor charged lower prices in some cities than in others. We found the directed verdict appropriate because there was no evidence that the defendant predatorily priced; in charging differential prices the defendant had not "sacrificed present revenues for the purposes of driving [the plaintiff] out of the market." [16] For proof of competitive effect, Stitt rests upon its assertion that the differences in price constitute predatory behavior.

As we have explained, Stitt failed to prove that Champion's pricing of spark plugs in the original and replacement equipment markets was predatory. On this record, then, there was no attempt to monopolize nor proof of "lessened competition" within the meaning of the Robinson–Patman Act.

Champion did not deny that it sold industrial spark plugs to NAPA, a national chain of auto parts stores, at a lower price than it sold to other warehouse distributors and intermediate sellers. However, Stitt never produced evidence that the price difference inhibited competition or even its ability to compete in the replacement plug market; indeed, Stitt's brief on appeal fails to offer any theory as to why this should be so. Because the Robinson–Patman Act only prohibits price-discrimination with the requisite anticompetitive effect, the district court was justified in entering a directed verdict on this issue.

## C

Stitt also alleged that Champion violated the Clayton Act in making agreements with distributors to carry Champion plugs exclusively. Section 3 of the Act makes it unlawful to

make a sale or contract for sale of goods ... on the condition, agreement, or understanding that the ... purchaser thereof shall not ... deal in the goods ... of a competitor ... of the ... seller, where the effect of ... such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.[17]

The written agreement between Champion and its distributors disclaimed any obligation for the distributor to carry only Champion products. Stitt alleges, however, that Champion secured such agreements under the guise of a promotional program known as "Feature Line Selling." Under the program, Champion analyzed the distributor's rate of inventory turnover to determine which non-Champion brands were worth carrying; the underlying principle was that a distributor could reduce inventory costs by carrying only Champion's full line of plugs. Champion supplemented this persuasion by offering distributors promotional gifts, ranging from jack-

---

**13.** 15 U.S.C. § 13(a).

**14.** 517 F.2d 714 (5th Cir.1975).

**15.** *Id.* at 721.

**16.** *Id.* at 723.

**17.** 15 U.S.C. § 14.

ets to refrigerators, if they removed competing spark plugs from their shelves. Several former Champion salespersons and supervisors testified that these incentives persuaded at least three distributors to agree to stop carrying Stitt plugs.

Whether there were exclusive dealing contracts was a jury question, perhaps, but it does not follow that the district court erred in its directed verdict. While Stitt proved that a handful of distributors once removed Stitt plugs from their shelves, Stitt proved no instance in which a distributor honored an exclusive dealing agreement by refusing to purchase Stitt plugs. In addition, there was no testimony that any distributor agreed to refrain from selling competing plugs for any specified period of time.[18] There was no evidence that a distributor who failed to abide by the agreement would be subject to any sanction and hence no reason to believe distributors did not feel free to stock competing plugs. More to the point, Stitt did not prove the extent of its foreclosure from the replacement market; Stitt offered no comparison between the number of distribution outlets available and the number of those foreclosed. Without more, no reasonable jury could have concluded that Champion's efforts foreclosed a "substantial share of the relevant market." [19]

Finally, Stitt's theory of the original-equipment preference is inconsistent with its claim that Champion denied Stitt access to the replacement market through exclusive-dealing contracts. Stitt would not gain much from access to distributors' shelves if Stitt could not place its plugs in original equipment and capture the consumer preference. Stitt's proof leads to the inescapable conclusion that the main competitive battle in this industry is fought at the front door of the original-equipment manufacturer. The jury was offered no proof that any anticompetitive practice of Champion handicapped Stitt in that fight.

## III

Stitt also challenges the judgment on the basis of two evidentiary rulings. One ruling precluded discovery and admission of evidence as to any matter before April 15, 1978, the date of an existing antitrust settlement between Stitt and Champion. The other ruling excluded from evidence a 1953 cease-and-desist order entered against Champion by the Federal Trade Commission. Keeping in mind that such evidentiary rulings are reviewable for abuse of discretion,[20] we find neither ruling to be a basis for reversal.

## A

The parties entered into a settlement on April 15, 1978, in which Stitt released Champion of any antitrust claims Stitt may have had at that time. The district court refused discovery of any document relating to Champion's activities before the settlement. The court also ordered such evidence excluded at trial.

Stitt argues persuasively that even though it could not sue Champion for conduct before the settlement, such conduct may be relevant to Champion's post-settlement activities and thus discoverable and admissible.[21] The argument is sound, as

---

18. *Cf. Denison Mattress Factory v. Spring-Air Co.*, 308 F.2d 403, 412 (5th Cir.1962) (finding exclusive-dealing contract permissible because it was terminable without cause in six months). The Seventh Circuit also recently has concluded that because they lack any serious anticompetitive effect, "[e]xclusive-dealing contracts terminable in less than a year are presumptively lawful under section 3." *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984).

19. *See Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 328–29, 81 S.Ct. 623, 628–29, 5 L.Ed.2d 580 (1961). We assume without deciding that Stitt adequately defined the relevant

market. The district court held that Stitt never demonstrated which manufacturers and models of spark plugs should be included in the market for industrial plugs. We need not reach the issue.

20. *See Jon–T Chemicals, Inc. v. Freeport Chemical Co.*, 704 F.2d 1412, 1417 (5th Cir.1983).

21. Many courts have followed a similar principle in permitting discovery of evidence pertaining to a defendant's conduct occurring before a limitations period has run. *See* Wright & Miller, Federal Practice & Procedure: Civil § 2009 n. 38 (1970 and Supp.1987).

far as it goes. However, we will reverse a judgment for an evidentiary ruling such as this only if it affects the "substantial rights of the parties."[22] Stitt has yet to articulate a legitimate theory of antitrust liability or to explain how the limit on discovery caused any prejudice. On these facts we will not speculate that the denial of discovery altered the result in this case.

## B

■ An FTC investigation of Champion begun in the late 1940s resulted in a cease-and-desist order against the company based on violations of the antitrust laws. Although no copy of the 1953 order appears in the record, Stitt urges that it would have tended to prove that Champion engaged in a "common scheme or pattern of conduct" to violate the antitrust laws and should have been admitted. But such an aged order is not probative of Champion's present practices. Moreover, because the order pertained only to Champion's conduct in the market for automotive spark plugs, it is of little relevance to Champion's present practices in the industrial-plug market.

■ Nor did excluding the order contravene 15 U.S.C. § 16(a), which provides that "a final judgment or decree" in an antitrust proceeding brought by the government constitutes "prima facie evidence" against the defendant in any subsequent proceeding brought by a non-government party "as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto." Again, the conduct of which Stitt complains does not extend back three decades; the order would have no collateral estoppel effect if the government brought these claims.

AFFIRMED.

---

**22.** *See* Fed.R.Evid. 103(a); *Tugwell v. A.F. Klaveness & Co.,* 320 F.2d 866, 868 (5th Cir. 1963), *cert. denied,* 376 U.S. 951, 84 S.Ct. 967, 11 L.Ed.2d 970 (1964).