**Brenda D. HARDY, Plaintiff–Appellant,**

v.

**CHEMETRON CORPORATION,
Defendant–Appellee.**

No. 87–4689.

United States Court of Appeals,
Fifth Circuit.

April 25, 1989.

Jim Waide, Estes & Waide, Tupelo, Miss., for plaintiff-appellant.

L.F. Sams, Jr., John S. Hill., Mitchell, McNutt, Bush & Lagrone, Tupelo, Miss., for defendant-appellee.

Before RUBIN, GARZA, and KING, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

An unfortunate woman lost the tips of two fingers when a bacon-slicing machine she was cleaning unexpectedly began to operate. Her misfortune was compounded when the jury in her tort suit against the manufacturer of the machine found for the defendant. She now appeals, alleging that the jury's verdict was insufficiently supported by evidence and that the district court made five erroneous evidentiary rulings, the most important of which excluded evidence of a subsequent design change that the woman asserts should have been admitted for purposes of impeachment. We hold that the district court's evidentiary rulings were within its discretion and that there was evidence sufficient to support the jury's verdict.

### I.

On October 5, 1983, Brenda Hardy lost the tips of two fingers while cleaning the bacon- and paper-slicing machine at which she worked. The power button had been switched off and the safety cage was raised, but the cutter nonetheless began to revolve. Invoking diversity jurisdiction, and relying on Mississippi law, Hardy sued Chemetron Corporation, the manufacturer of the machine, alleging that the machine was defective and unreasonably dangerous.

### II.

Hardy first argues that the district court should have directed a verdict in her favor. The slicer began to cycle when turned off

and while its safety cage was raised, she points out, and thus, "did not meet reasonable expectations of safety, and was, as a matter of law, 'unreasonably dangerous.'"

In order to recover under Mississippi law, Hardy was required to prove: "(1) that the plaintiff was injured by the product, (2) that the injury resulted from a defect in the product which rendered it unreasonably dangerous, and (3) that the defect existed at the time it left the hands of the manufacturer."[1] Even if Chemetron's machine was unreasonably dangerous at the time Hardy was injured, therefore, she had the burden of demonstrating that the defect existed when the machine left Chemetron's control.

Chemetron presented credible evidence that the unsafe condition of the machine developed because of poor maintenance by Mid–South, Hardy's employer. Chemetron's expert witness, Jeffrey Bookwalter, testified that the accident was caused by a short-circuit that resulted from the failure of Mid–South to maintain the wiring of the machine. Because the jury could have believed this evidence, the district court properly refused to direct a verdict, and we cannot conclude that the jury's verdict was against the great weight of the evidence.

### III.

Hardy next objects that Bookwalter's testimony should have been excluded because his response to interrogatories "contains not a hint that the expert witness was of the opinion that the accident was caused by a short circuit." Chemetron responds by quoting from its reply to interrogatories: "Mr. Bookwalter will testify that the subject machine was poorly maintained and that this could have caused or contributed to the accident." Although this statement was not specific, it sufficed to give Hardy fair warning of the expert's expected testimony. While Bookwalter appears to have become convinced of the theory that a short-circuit had occurred only after listening to trial testimony, and stated the theory for the first time at trial, this

---

**1.** *Early–Gary, Inc. v. Walters,* 294 So.2d 181, 186    (Miss.1974).

did not mandate its exclusion. Moreover, the district court had discretion to refuse to sanction Chemetron by excluding Bookwalter's testimony even if, on balance, Chemetron should have supplemented its responses to interrogatories.[2]

## IV.

■ Hardy asserts that the district court also erred in several evidentiary rulings. In reviewing these rulings we recognize that a trial court must make hundreds of evidentiary rulings in the course of a trial and often must decide whether to admit or exclude evidence almost instantaneously. No trial judge can be, or is expected to be, infallible in making these decisions. The trial judge moreover has the feel of the trial, sensing its tempo, the effect of evidence, and the likely probative value of proffered testimony. Acknowledging both our respect for the local judge's superior knowledge of the trial scene and the importance of enabling the trial judge to keep the trial on course, we accord considerable deference to the trial judge's evidentiary rulings. In assessing Hardy's claims, therefore, we apply two well-settled principles of law. The first is stated in Federal Rule of Evidence 103(a): "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected," and the second is that, as a general precept, we overturn an evidentiary ruling and, in consequence, reverse judgments and grant new trials, only if the ruling was so erroneous as to constitute an abuse of discretion.[3]

■ Hardy first challenges the trial court's refusal to admit evidence concerning a prior accident that had occurred with a machine that she claims was similar to the slicer that injured her. The court excluded the evidence because Hardy had failed to prove that the two accidents were substantially similar, but Hardy claims that she was unable to prove similarity only because Chemetron informed her of the prior accident a mere eight days before trial. Hardy did, however, over Chemetron's objection, obtain an admission from Chemetron's expert that another accident had occurred before the one that injured her. She thus was not totally unable to present evidence concerning the matter.

Chemetron had discovered the prior accident only after filing its initial replies to interrogatories, and does not appear to have been in bad faith in failing to supplement its answers earlier. If eight days did not provide sufficient time for Hardy to investigate the accident, she should have requested that trial be postponed. Instead, she declared herself ready for trial, and cannot now complain that the trial judge should have ignored her total lack of evidence on the crucial question of substantial similarity.

## V.

Hardy next claims that the district court should not have excluded several admissions allegedly made by Chemetron, including a statement by a claims adjuster that Hardy's machine had "an electrical problem." Because Hardy identifies only two specific admissions that she asserts were improperly excluded, this court can consider only those two.

■ First, the purported admission that the slicer had an electrical problem was made by a claims adjuster who was an agent of Chemetron's insurer, but not of Chemetron itself. Moreover, the adjuster's statement was arguably so vague as to be irrelevant and certainly too vague for its exclusion to merit a retrial of this case. Although the jury did not learn that the adjuster wrote, without explanation, that "the problem with the machine was an electrical problem," we cannot believe that the jury's ignorance of this fact, even if it resulted from an erroneous evidentiary ruling, affected any substantial right.

2. *See Murphy v. Magnolia Electric Power Ass'n,* 639 F.2d 232, 234–35 (5th Cir.1981).

3. *See, e.g., McGonigal v. Gearhart Indus., Inc.,* 851 F.2d 774, 777 (5th Cir.1988); *Stitt Spark*

*Plug Co. v. Champion Spark Plug Co.,* 840 F.2d 1253, 1258 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 224, 102 L.Ed.2d 214 (1988).

■ The second purported admission that Hardy claims should not have been excluded was a statement in a letter by Steven Newell, defendant's engineer, that engineering changes disabling two motors as well as the clutch in the slicer would prevent accidental actuation of the machine. Once again, the district court did not err. In context, Newell's statement clearly referred to a subsequent design change, evidence of which was inadmissible. Moreover, at trial Chemetron admitted the truth of Newell's statement that redesigning the machine would help prevent accidental injuries, and the district court allowed Newell to testify orally that rewiring the slicer would have made it safer. We can find no abuse of discretion here.

## VI.

■ Hardy's next argument reflects a basic misunderstanding of the law of evidence. The district court excluded a statement by Andrew Murnyak that only one of Chemetron's machines was wired as Hardy's was wired because Murnyak had submitted an affidavit asserting that this remark had referred to an aspect of the wiring not relevant to this case. Hardy claims that the jury might have disbelieved Murnyak's affidavit concerning the context of his statement, that questions of credibility should be left to the jury, and consequently, that Murnyak's statement should have been admitted.

Hardy's argument must be rejected. "When the relevancy of evidence depends upon the fulfillment of a condition of fact," Federal Rule of Evidence 104(b) provides, "the court shall admit it upon ... the introduction of evidence sufficient to support a finding of the fulfillment of the condition." Thus the jury is called upon to judge the credibility of evidence whose relevance is conditioned on fact only after the party offering the evidence has made a threshold showing of relevance to the court. In this case, no credible evidence was presented to support Hardy's claim that Murnyak's statement concerned the wiring fault that allegedly caused her injury. Hardy's brief mentions no such evidence, and Michael Stevens, the man to whom the statement was made, conceded that he would not contest Murnyak's affidavit that his statement did not concern the alleged wiring defect at issue. Moreover, Murnyak's statement was too tangentially related to the issues in dispute at trial for its exclusion, even if erroneous, to have affected any substantial right. Excluding Murnyak's statement was not therefore error.

## VII.

Finally, Hardy asserts that the district court should have admitted evidence of a subsequent design change. After Hardy's accident, and apparently to avoid a recurrence of such an episode, Chemetron rewired its slicers so that the safety features of the machine would disable its motors as well as its clutch. In order to encourage design changes after accidents have occurred, the Federal Rules of Evidence provide, "evidence of ... subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event."[4] This rule applies in strict liability as well as in negligence actions.[5] The Rules also provide an exception, however: "This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment."[6]

Evidence of Chemetron's rewiring should have been admitted, Hardy claims, "to impeach Defendant's trial position that the cause of this accident was not the way the machine was wired, and also ... Defendant's claim that, after all, this machine had operated properly after the accident." Thus Hardy first maintains that she should have been allowed to impeach Chemetron's

---

4. Fed.R.Evid. 407.

5. *Grenada Steel Indus. v. Alabama Oxygen Co.,* 695 F.2d 883 (5th Cir.1983).

6. Fed.R.Evid. 407.

"trial position" that negligent wiring had not caused her injury, which, minus a double negative, amounts to saying that she should have been allowed to adduce evidence of the rewiring to prove Chemetron's negligence. This is precisely what Rule 407 was designed to prevent. As the Seventh Circuit has explained:

> This exception must be applied with care, since "any evidence of subsequent remedial measures might be thought to contradict and so in a sense impeach [a party's] testimony that he was using due care at the time of the accident ... [I]f this counted as 'impeachment' the exception would swallow the rule." [7]

This circuit has recognized that risk and held that the trial judge should guard against the improper admission of evidence to prove prior negligence under the guise of impeachment.[8]

■ Evidence of subsequent measures is no more admissible to rebut a claim of non-negligence than it is to prove negligence directly. Hardy's argument is but a semantic manipulation, and must therefore be rejected. Even if the decision to admit or exclude the evidence of the design change was a close call, moreover, we do not believe that excluding it was beyond the bounds of the district court's discretion.

*Muzyka v. Remington Arms Co.,*[9] which Hardy claims "controls," is in fact inapposite. In *Remington Arms,* the defendant stressed the safety and superiority of its products at such length that a panel of this circuit held, over Judge Gee's dissent, that evidence of a subsequent design change should have been admitted "in impeachment of the experts who spoke in ... superlatives," experts who had described a rifle that the plaintiff claimed had misfired as "the premier rifle, *the* best and *the* safest rifle of its kind on the market." [10] Chemetron's experts did not testify in such terms, and Chemetron conceded the fea-

sibility of the design change they had adopted after Hardy's accident. There was no risk that the jury in this case would have been misled by a defendant's extravagant boasts. Consequently, *Remington Arms* does not mandate reversal here.

Hardy further maintains, as quoted above, that evidence of the subsequent design change should have been admitted to impeach Chemetron's claim that the machine she had operated functioned without incident after her injury. This claim, she asserts, was made in the testimony of Ella Mae McIntosh. At first glance, this appears to be Hardy's most compelling argument; the facts, however, do not support it. McIntosh testified that she had operated Hardy's machine without incident after Hardy's injury, but only on the day the injury occurred, which was three weeks before any rewiring took place. Thus McIntosh made no misleading claims about the subsequent functioning of the machine, and evidence of the subsequent design change would not have impeached her testimony.

In her brief, Hardy points to no other evidence that the subsequent design change might have been used to impeach. At oral argument, however, her counsel extended her impeachment theory in two respects. First, he suggested that evidence of the subsequent change should have been admitted to rebut testimony that the design Hardy advocated was impractical. Chemetron, however, provided ample evidence that it was not challenging the practicality of rewiring: it admitted in a deposition that was read to the jury that the wiring change was both technically and economically feasible, and further stated that it did not know of any disadvantages of rewiring. The sole testimony on the subject at trial was that it was "more practical" to wire the machine in the way it was originally wired to prevent "wear and

---

**7.** *Public Service Co. of Indiana v. Bath Iron Works Corp.,* 773 F.2d 783, 792 (7th Cir.1985) (quoting *Flaminio v. Honda Motor Co.,* 733 F.2d 463, 468 (7th Cir.1984)).

**8.** *Bickerstaff v. South Central Bell Tel. Co.,* 676 F.2d 163, 168 (5th Cir.1982) (quoting 10 Moore's

Federal Practice, § 407.04 at p. IV–159 (2d ed. 1981)).

**9.** 774 F.2d 1309 (5th Cir.1985).

**10.** *Id.* at 1313 (original emphasis).

tear." Chemetron's expert did not testify or state, however, that the alternative design was impractical. The district court therefore did not abuse its discretion in refusing to admit evidence of the subsequent design change to rebut testimony concerning the impracticality of rewiring.

Second, Hardy's counsel asserted that the evidence of the subsequent change should have been admitted to rebut testimony that the design change would not have prevented the accident. The fact that the change was made, however, in no way demonstrates whether the change would or would not have prevented the accident. The district court therefore did not err by excluding evidence of the subsequent design change, and at the very least, was well within the bounds of its discretion in refusing to admit it.

Although other theories might now be developed to support Hardy's impeachment claim, only those we have addressed were advanced in either the briefs or the oral argument. We cannot and do not overturn district court judgments on the basis of arguments that counsel might have, but did not, make. Arguments conceived for the first time after both actual trial and appellate briefing are but *l'esprit de l'escalier.*

### VIII.

For the foregoing reasons, the judgment in this case is AFFIRMED.

GARZA, Circuit Judge, dissenting:

I concur in Parts I–VI of the majority opinion. I am convinced, however, that it was reversible error for the district court to exclude evidence of defendant's subsequent remedial measures when it was offered for the purpose of impeachment. From Part VII of the majority opinion, therefore, I dissent.

My analysis of Rule 407 under the circumstances presented in this case requires a somewhat more detailed rendition of the facts than is presented by the majority. Of particular importance to a complete understanding of this case are: 1) an appreciation of the way that the machine which injured Mrs. Hardy worked, and 2) an examination of the testimony of defendant's expert, Mr. Jeffrey Bookwalter, whose statements repeatedly opened the door to impeachment by evidence of defendant's subsequent design changes.

### I.

Mrs. Hardy's employer, Mid–South Packers, is in the business of packaging meat products. The paper cutter that injured the plaintiff in this case is a component of a larger bacon slicing and packaging operation at Mid–South. It works basically as follows: Large slabs of bacon are sliced up into thin strips by a circular rotating slicing knife. The strips fall onto a sheet of wax paper that moves approximately ten feet "upstream" on a conveyor belt. The belt, the bacon strips, and the wax paper pass beneath a second blade, a circular rotating paper-cutting knife, which is regulated to cut at intervals, leaving the desired number of bacon strips on an appropriately sized sheet of wax paper.

When the machine is in operation, the paper-cutting knife is enclosed in a safety cage. By raising this cage, the operator of the machine trips a limit switch, thereby disengaging the clutch that connects the knife to an electric motor. The circular knife blade, thus, is supposed to stop spinning when the safety cage is in the raised position. A redundancy feature also allows the operator to shut down the motor that drives the knife by setting a switch, located approximately six feet upstream from the paper-cutting knife, to the "off" position.

At the time of this accident, the logic of the electrical circuitry system would allow the motor to continue running even though the operator had raised the safety cage; raising the cage merely served to disengage the clutch that connected the motor to the circular knife blade. On October 15, 1983, plaintiff was cleaning debris from around the paper-cutting knife when the machine "cycled" and cut off the ends of the index and middle fingers on her right hand. According to uncontroverted trial testimony, the safety cage was raised and

the on/off switch was in the "off" position when the accident occurred.

An engineering expert for the plaintiff testified that the accident might not have occurred if the paper cutter had been wired such that raising the safety cage would shut down the motor instead of merely disengaging the clutch. Chemetron's engineering expert asserted that the accident might have been caused by a short circuit resulting from excessive moisture around the terminal or from degraded wire insulation. In other words, Chemetron claimed that improper maintenance by Mid–South was an intervening cause of the accident. In addition, the same expert witness testified that re-wiring would not have prevented the accident since, in the event of a short circuit, the electrical impulse would have continued to the motor just as it had travelled to the clutch. Defense counsel elicited testimony to this same effect on cross examination of Mr. Mike Stevens, a Mid–South mechanic.

Plaintiff's counsel attempted to introduce evidence that Chemetron rewired the paper cutter shortly after the accident so that raising the safety cage would turn off the motor as well as disengage the clutch. Chemetron's senior engineer, Mr. Steven Newell, wrote a letter in connection with this redesign indicating that the rewiring would "prevent accidental actuation of the paper knife and possible injury." The district court ruled the evidence of the rewiring inadmissible as a subsequent remedial measure under Federal Rule of Evidence 407. The court also refused to allow any reference to Mr. Newell's letter because it was written in connection with the subsequent remedial measure.

## II.

Rule 407 precludes introduction of subsequent remedial measures "to prove negligence or culpable conduct" on the part of the defendant in connection with an accident. The rule does not apply, however, when the measures are offered "for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, *or impeachment.*"

Fed.R.Evid. 407. [emphasis added]. Chemetron never denied the feasibility of rewiring the safety cage limit switch so that it would shut down the motor in addition to disengaging the clutch. There appear in the record, however, at least three instances in which the letter written by Chemetron's senior engineer, Mr. Newell, contradicted the trial testimony of defendant's expert, Mr. Jeffrey Bookwalter.

In expanding upon the hypothesis that a short circuit may have caused the accident, defense counsel asked Mr. Bookwalter about the "possibility that a short circuit would have occurred that would have bypassed these two on-off switches to the clutch, what would be the effect of a short circuit bypassing the breaker system to a motor?" To this query, Mr. Bookwalter replied, "Well, if you got a short circuit that was past the breaker that was leading to a motor, it would let the motor continue to run, or cause the motor to continue to run." In other words, Mr. Bookwalter's opinion was that rewiring the safety-cage limit switch to shut down the motor would not necessarily have prevented accidental actuation of the paper knife. This testimony directly contradicts the statement of Mr. Newell, the Chemetron senior engineer, to the effect that the rewiring was done to prevent such accidental cycling of the knife.

The second instance in which trial testimony was susceptible to impeachment by the existence of subsequent design changes also occurred during the direct examination of Mr. Bookwalter. In response to a question from defense counsel, Mr. Bookwalter asserted that "the machine was put into operation again the same day, and there was no particular problem associated with it." Defense counsel elicited this same evidence, on other occasions during the trial, from Mr. Bookwalter as well as from other witnesses. The inference here is that the machine has performed, trouble-free, from the day of the accident onward without subsequent design changes. That Chemetron did in fact rewire the safety mechanisms is contrary to the impression left by such evidence.

Allowing evidence of the rewiring under these circumstances does not violate Rule 407. The purpose of introducing this evidence would not be "to prove negligence or culpable conduct;" rather, its purpose would be to impeach testimony to the effect that the machine was placed back in operation unchanged. Rule 407 is not an impenetrable shield behind which a defendant may hide evidence of subsequent design changes with impunity. If counsel wishes to keep evidence of defendant's subsequent remedial measures away from the jury, it must avoid opening the door to impeachment through suggestions or inferences that no such remedial measures ever were taken. That is precisely the implication, disregarded by both the trial court and the majority, of the very existence of an impeachment exception to Rule 407.[1]

Finally, Mr. Bookwalter testified that rewiring the switch so that the motor shut down each time the operator raised the safety cage would "increase the wear and tear" on the motor. Such an arrangement, according to Mr. Bookwalter, would be less practical than the one originally designed into the machine.

Practicality is different from feasibility; I do not imply that the two concepts are interchangeable. Once again, however, Rule 407 should not protect from impeachment a defendant who suggests at trial that a practical manufacturer would not employ precisely the design which the defendant eventually utilized. Counsel may avoid the damaging impact of evidence of subsequent remedial measures only by keeping the door to impeachment firmly closed.

We have previously held that the trial court may permit evidence of design change for purposes of impeachment. *Muzyka v. Remington Arms Co., Inc.*, 774 F.2d 1309 (5th Cir.1985). In the *Remington Arms* case, a Remington Model 700 rifle misfired while it was being unloaded. The bolt-action design of the rifle required that it be placed in the safety-off position before unloading. Plaintiff's stepfather was removing a round from the rifle's chamber when it fired. The bullet ricocheted and struck the plaintiff.

Defendant Remington subsequently redesigned the rifle in such a way that the weapon could be unloaded with the safety in the "on" position. During the course of the trial, defense counsel repeatedly elicited testimony that the Remington Model 700 was the most popular, the best, the strongest, and the safest rifle ever manufactured. Significantly, the design that was subsequently adopted by Remington—evidence of which was excluded at trial—was disparaged by defense witnesses (just as Mr. Bookwalter decried the design subsequently adopted by Chemetron). We held that "evidence of the design-change should have been permitted for purposes of impeach-

---

1. Rule 407 serves the important social policy of encouraging manufacturers and employers to take steps that result in added safety. The majority is properly concerned about the risk that the impeachment exception, if used improvidently, would "swallow up" the general rule excluding evidence of subsequent remedial measures. That concern, however, is simply misplaced in this case.

First, the defendant was at all times in control of the risk that evidence of the subsequent design changes might be admitted. Chemetron could have kept the door to impeachment firmly closed. Instead, it repeatedly elicited impeachable statements from its witnesses and then utilized the preclusive effect of Rule 407 to leave the plaintiff without the ability to rebut the damaging inferences thereby presented to the jury.

Second, the prejudice to the plaintiff of allowing defendant's impeachable statements to go unassailed before the jury outweighs any possibility that the exception might have a corrosive effect in future cases not now before us.

Finally, the admission of the type of evidence in question here does not create a foregone conclusion that plaintiffs will always prevail. The impeaching statements about the subsequent design will be evaluated and weighed by the jury along with all the other evidence in the case, including any reasons put forth by the defendant for the redesign. In addition, the evidence will be accompanied by a limiting instruction cautioning the jury to consider the evidence only as it bears upon the credibility of the witness or witnesses being impeached.

In any event, proper attention to the task of "keeping our eyes on the ball" would induce us to focus on Mrs. Hardy's cause of action. And her case simply does not warrant the majority's concern about damaging the integrity of Rule 407.

ment." *Remington Arms*, 774 F.2d at 1313.[2]

I find stronger support for admission of such impeachment evidence here than was the case in *Remington Arms*. Judge Gee dissented in that case because the jury had found that the unloading of the rifle was done in a negligent manner and was thus the *sole* cause of plaintiff's injury. For this reason, it seemed to Judge Gee unlikely that evidence of Remington's design change would have influenced the jury in any significant way. *Id.* at 1314. In the case at bar, however, there was no jury finding of negligence on the part of Mrs. Hardy. The actual cause of the malfunction that injured her was never determined.

Our review, of course, does not end with a determination that the district court committed error in an evidentiary ruling. We will reverse the ruling only if it affected a substantial right of the adverse party. Fed.R.Evid. 103(a); 28 U.S.C. § 2111 (1949); *Whitehurst v. Right*, 592 F.2d 834, 840 (5th Cir.1979). The answer to the question whether exclusion of the impeachment evidence in this case was harmless error is not one that is entirely free of doubt. Our standard of review, however, is not one of indubitability. "It is not for us to decide that the effect of what was excluded might not have altered the jury's views.... [I]f there was a reasonable likelihood that a substantial right was affected, we should not find the error harmless." *Johnson v. William C. Ellis & Sons Iron Works*, 609 F.2d 820, 823 (5th Cir.1980). I find such a reasonable likelihood here.

The impeachment exception to Rule 407 is not surplusage; it was drafted for a reason. If, as the majority holds today, the case at bar does not fall within the exception, it is difficult to imagine one that would. I do not believe that Rule 407 permits a defendant who has effected subsequent design changes to make statements which repeatedly imply that no subsequent remedial measures were taken, or that no practical manufacturer would consider taking such measures, or that such changes would, in any event, simply not work. In three different ways, and on at least three different occasions during trial, Chemetron's expert laid these inferences before the jury and then hid within the shelter of Rule 407, notwithstanding the existence of credible impeachment evidence that the trial judge prevented the plaintiff from presenting.[3]

In light of these errors, it is clear to me that Mrs. Hardy did not receive a fair trial. That is most unfortunate. What is more unfortunate still is that a majority of this Court has failed to remedy such a wrong. I would hold that the jury was entitled to hear the evidence that would cast doubt upon Chemetron's assertions that rewiring would not have prevented the accident, that

---

**2.** The majority's attempt to distinguish *Remington Arms* entirely misses the import of that case. The majority states that Chemetron's experts did not speak in superlatives when they described their paper cutter and, therefore, *Remington Arms* is wholly "inapposite" to the case at bar. The distinction is an artificial one. I would resist limiting the reasoning in *Remington Arms* to those situations where the opportunity for impeachment arises only when the defendant uses superlatives to describe his product. It is unwise, in my estimation, to restrict the use of subsequent design measures for impeachment purposes only as against defendants whose witnesses recite the words, "the best," or "the safest." These words possess no talismanic qualities.

In *Remington Arms,* the defendant opened the door to impeachment by using certain words to describe his product. Those words happened to be superlatives. They were not the same words that Mr. Bookwalter used to describe Chemetron's product in the instant case. But whether or not the experts in both cases used the same words to open the door to impeachment should not be the controlling consideration. The true import of the *Remington Arms* case is that it establishes the admissibility in this circuit of evidence of subsequent remedial measures when the defendant opens the door to use of that evidence for impeachment purposes. The majority's view artificially narrows the holding in *Remington Arms* and threatens to eviscerate it of its true meaning.

**3.** Had the defendant elicited impeachable statements only once, or even twice, then the majority's characterization of this decision as a "close call" might carry some force. But the defendant here opened the door to impeachment three times. The cumulative effect of excluding the evidence in question on all of these occasions was error that affected a substantial right of the plaintiff.

rewiring was not practical, and that the machine was placed back into trouble-free operation without subsequent changes. On the basis of the trial court's exclusion of the impeachment evidence, therefore, I would vacate the verdict and judgment in favor of Chemetron Corporation and remand the cause for a new trial.