The appellant, Charles Blythe, was injured while operating a Craftsman Weed Wacker gas-powered, curved-shaft line trimmer. The line trimmer was owned by the parents of Blythe's girlfriend, Donna Bassett. It had been modified by the attachment of a 10-inch metal blade. The line trimmer carried a warning that stated:
 "Don't use metal blades with this unit. It doesn't have the necessary protective equipment. For safe operation read operator's manual."
The metal blade had been attached to the line trimmer by Jessie Turner, who was the boyfriend of Donna's sister, Lynn. The blade, purchased at a Handy City store, stated on its packaging that it was for use on a Weed Eater model XR-90 line trimmer. The model XR-90 is unlike the curved-shaft line trimmer in that it is a straight-shaft line trimmer marketed with a metal blade and corresponding safety features that are not on a curved-shaft line trimmer. Blythe was injured when the blade kicked back and cut his leg. His leg *Page 863 
was ultimately amputated because of the injuries suffered.
Blythe filed suit against Sears, Roebuck Company, the retailer of the line trimmer, and Poulan/Weed Eater, a division of Emerson Electric Company and manufacturer of the line trimmer, claiming that the line trimmer was defectively designed because a metal blade would easily fit a curved-shaft line trimmer, such as the Craftsman Weed Wacker, and claiming that the fact that a blade would easily fit created a dangerous condition. Blythe also claimed that the failure to put on the blade a warning that the blade was not to be used with a curved-shaft line trimmer made the blade unreasonably dangerous.
Sears and Poulan presented expert testimony from Ronald Loyd, who had designed the line trimmer and the blade, as well as other products, while employed with Poulan from 1973 to 1982. Loyd testified that there were design features of the line trimmer that prevented a metal blade from being easily attached, including the fact that the hub of the line trimmer was larger than the hole in the blade. He also testified that, in his opinion, the instruction on the metal blade package, stating that the blade was to be used with a straight-shaft line trimmer, taken along with the warning provided on the shaft of the curved-shaft line trimmer, was adequate. Blythe, during the cross-examination of Loyd, attempted to introduce a new metal blade that carried the warning: "Do not use on unit with curved drive shaft." The trial judge excluded the evidence as evidence of a subsequent remedial measure.
The jury returned a verdict against Blythe and in favor of Sears and Poulan. Blythe moved for a new trial, based upon the trial court's exclusion of the evidence of the new warning on the metal blade manufactured after the date of Blythe's accident. The trial court denied the motion, and Blythe appealed.
The single issue on appeal is whether evidence of a subsequent design change should have been admitted for the purpose of impeachment of an expert witness who had testified that the product was safe as marketed. "It is axiomatic that rulings as to the admissibility of evidence rest largely within the discretion of the trial court. Such rulings will not be disturbed on appeal in the absence of a gross abuse of discretion." Russellville Flower Craft, Inc. v. Searcy,452 So.2d 478, 480 (Ala. 1984).
The general rule excluding evidence of subsequent remedial measures is that "evidence of repairs or alterations made, or precautions taken, by the defendant after the injury to the plaintiff in an accident is not admissible as tending to show the defendant's antecedent negligence [or culpable conduct]." C. Gamble, McElroy's Alabama Evidence § 189.02(1) (4th ed. 1991) (citing Macon County Comm'n v. Sanders, 555 So.2d 1054
(Ala. 1990); Hyde v. Wages, 454 So.2d 926 (Ala. 1984); BannerWelders, Inc. v. Knighton, 425 So.2d 441 (Ala. 1982)). Subsequent remedial measures have been excluded on two grounds: (1) evidence of a subsequent repair or change was irrelevant to show antecedent negligence, see Hart v. Lancashire YorkshireRy., 21 L.T.R. 261, 263 (1869), cited in Comment, TheImpeachment Exception to Rule 407: Limitations on theIntroduction of Evidence of Subsequent Measure, 42 U.Miami L.Rev. 901, 903 (1988); see also Proposed Rules of Evidence,46 F.R.D. 161, 236 (1969); and (2) public policy favored promoting safety by removing the disincentive to repair, see AlabamaPower Co. v. Marine Builders, Inc., 475 So.2d 168, 171-72
(Ala. 1985); see also Probus v. K-Mart, Inc., 794 F.2d 1207,1210 (7th Cir. 1986). Even though the rule was established to exclude evidence of subsequent repairs, evidence of such repairs could be introduced for purposes other than proving negligence or culpable conduct. One of the other purposes was impeachment.
Evidence of subsequent remedial measures was used for impeachment purposes to prevent a defendant from gaining an unfair advantage from self-serving, false, or misleading statements that would go unchallenged under the exclusionary rule. See Going v. Alabama Steel Wire Co., *Page 864 141 Ala. 537, 37 So. 784 (1904), Bedgood v. T.R. Miller MillCo., 202 Ala. 299, 80 So. 364 (1918); Frierson v. Frazier,142 Ala. 232, 37 So. 825 (1904). These cases allowed a defendant who made self-serving, false, or misleading claims to be impeached by evidence of a subsequent remedial measure that contradicted his testimony or constituted a statement or act inconsistent with his present testimony.
When evidence of a subsequent remedial measure is offered to impeach a witness's statement through evidence of a prior inconsistent act, the Alabama cases seem to require (1) that the introduction of the testimony a party seeks to impeach has been initiated by the defendant; see, e.g., Bedgood v. T.R.Miller Mill Co., supra; (2) that the testifying witness had some control over the subsequent repair or alteration; see, e.g., Frierson v. Frazier, supra; and (3) that the evidence meet the test established by Holland v. First National Bank ofBrewton, 519 So.2d 460 (Ala. 1987). The rationale seems to be that evidence of a subsequent remedial measure is not evidence of conduct inconsistent with the testimony of a witness who did not authorize or direct the change because, in regard to such a witness, the change cannot be said to be the "prior act" of the witness. However, it is apparent that such evidence may be inconsistent with the same testimony from a witness who had authorized the change. See Frierson v. Frazier, supra; see alsoBrown v. Flying Wheels Motorcross Club, 569 So.2d 313
(Ala. 1990) (this Court held that although evidence of a subsequent remedial measure could be admissible to impeach, it was properly excluded by the trial court under Holland, supra).
If an attempt is made to use evidence of a subsequent remedial measure to impeach the testimony of a witness who did not authorize or direct the change, the cases from this jurisdiction, as well as federal cases interpreting Fed.R.Evid.407, seem to require that the evidence clearly contradict the testimony of the witness. Evidence of a subsequent remedial measure can be introduced to show that the witness has testified in a false or misleading manner, and the very existence of the subsequent remedial measure, if it clearly contradicts the witness's testimony, is clear and convincing evidence that the witness's testimony is false. See Bedgood,supra. Also, evidence of a subsequent remedial measure may be introduced when the witness testifies in superlatives, e.g., that the condition was "the safest" or the "the best." CompareMuzyka v. Remington Arms Co., 774 F.2d 1309 (5th Cir. 1985) (expert testified that the rifle manufactured by the defendant was the "safest" and "best" rifle of its kind; testimony as to subsequent design change was allowed), with Probus v. K-Mart,Inc., supra (expert testified that material used in the plastic cap was "appropriate for its intended use"; testimony as to subsequent change in material used was not admitted). The rationale behind this rule is that if the plaintiff were allowed to impeach the defendant or his witness who testified that the condition was safe at the time of the accident, the exception for impeachment would become the rule. Probus, 794 F.2d at 1210.
The case of Hardy v. Chemetron Corp., 870 F.2d 1007 (5th Cir. 1989), illustrates the rationale and application of impeachment through contradiction of a witness's testimony with evidence of a subsequent remedial measure. In Hardy, the plaintiff was injured while cleaning a bacon-slicing machine. She filed a products liability action, alleging that faulty wiring had caused her injury. The defendant contended that the accident was the result of the plaintiff's employer's improper maintenance of the machine and not the result of faulty wiring. The plaintiff then sought to introduce evidence of the defendant's subsequent rewiring of the machine in order to "impeach [the defendant's] 'trial position' " that the cause of the accident was not the wiring. Id. at 1010-11. (Emphasis supplied.) The Fifth Circuit Court of Appeals held that to allow the plaintiff to impeach the defendant's "trial position" would be the same as allowing the plaintiff to use the evidence of the rewiring to "prove" the defendant's negligence. The court stated: *Page 865 
 " 'This [impeachment] exception must be applied with care, since "any evidence of subsequent remedial measures might be thought to contradict and so in a sense impeach [a party's] testimony that he was using due care at the time of the accident. . . . [I]f this counted as 'impeachment' the exception would swallow the rule." ' "
Id. at 1011 (quoting Public Service Co. of Indiana v. Bath IronWorks Corp., 773 F.2d 783, 792 (7th Cir. 1985) (in turn quotingFlaminio v. Honda Motor Co., 733 F.2d 463, 468 (7th Cir. 1984))).
In Holland, supra, this Court established a three-factor test for the admissibility of evidence of subsequent remedial measures offered for impeachment. The three factors are:
 "(1) whether the 'other purposes' are material; that is, at issue in the case; (2) whether they are relevant to the issue in the case; that is, whether the evidence tends to prove the purpose for which it is offered; and (3) whether the probative value of the evidence is substantially outweighed by its prejudicial effect."
Id. at 462 (citing Gamble and Windle, Remedial MeasuresDoctrine in Alabama: From Exclusion to Admissibility and theDeath of Policy, 37 Ala.L.Rev. 547 (1986)). We now hold that when the alleged "impeachment" does not meet the standards set out above, the evidence of subsequent remedial measures is irrelevant; that is, not probative of the issue of credibility of the witness.
On direct examination, Loyd did not controvert the feasibility of placing a new warning sticker on the metal blade, nor did he make any exaggerated statement as to the warnings on the metal blade. He testified that he had not been involved in the subsequent change. His direct testimony pointed to the express warnings on the curved-shaft line trimmer and the design of the curved-shaft trimmer and the metal blade as an adequate safety system.
Blythe conducted a lengthy cross-examination on this point, during which the trial court allowed him to question Loyd regarding the new warning on the blade. The trial court allowed Blythe to use the new metal blade during his cross-examination, but did not allow the new metal blade to be admitted into evidence.
In argument before the trial court, Blythe's counsel stated:
 "I offer Plaintiff's Exhibit 9 [the new metal blade] to impeach the testimony of this witness, to show to this jury that this defendant, after they manufactured and sold this blade that's in evidence that was put on this machine, went out and put additional warnings on this new blade that go to the very heart of what we're talking about in this case. . . .
 "And the evidence is the machine we have in question that the blade got on was exactly the kind of machine that this instruction here says do not use on unit with curved drive shaft. That's exactly the instructions that I say should have been on the blade that was sold. It was not put on there and this is not done but for the purpose of impeaching this witness."
In his brief to this court, Blythe argues that the reason he wanted to admit the evidence was to argue that, "If the defendants really believe the product is safe, then why did they add, the very next year, a warning which warns of the very danger that injured Rusty Blythe?" "[T]he trial judge should guard against the improper admission of evidence to prove prior [culpable conduct] under the guise of impeachment." Hardy v.Chemetron Corp., 870 F.2d at 1011. Trying to prove prior culpable conduct on the part of Sears and Poulan through the use of the subsequent warning appears to be precisely what Blythe was trying to accomplish through the admission of the subsequent warning on the metal blade. Therefore, we are unable to hold that the trial court's refusal to allow the new metal blade into evidence was an abuse of his discretion.
Loyd testified that the blade and the line trimmer, together as a system, were safe and that the warnings were adequate. He was cross-examined on this point, and Blythe's counsel was allowed to use the *Page 866 
new blade and package during this cross-examination, but he was not allowed to admit them into evidence. The trial judge did not abuse his discretion in excluding this evidence of a subsequent remedial measure.
AFFIRMED.
HORNSBY, C.J., and ALMON, ADAMS and STEAGALL, JJ., concur.