Appeal by plaintiff, Eulyn H. Sims, from a judgment entered upon a jury verdict for the defendant, Knollwood Park Hospital, in plaintiff's action based upon negligence and breach of an implied agreement. We reverse and remand.
While a patient at Knollwood, plaintiff had surgery for the removal of her gallbladder. She was placed in the intensive care unit of the hospital. While there, Mrs. Sims fell from a chair in which she had been placed and sustained a hip fracture.
Mrs. Sims's complaint against the hospital contained two counts. Count I alleged that the defendant negligently caused or allowed plaintiff to fall and injure herself while in the intensive care unit, with the proximate consequence being her permanent injury; pain; and mental anguish. Count II alleged an implied agreement, for a consideration, to treat, nurse, care for, and observe plaintiff while she was a patient, and a breach of that agreement to her injury.
Defendant hospital answered, denying any negligence and any implied agreement. Trial by jury ensued, with plaintiff withdrawing Count II, the allegation of an implied agreement. The jury returned a verdict for the defendant on Count I.
Plaintiff has presented a number of issues for our review. Among these is the trial court's denial of a discovery request made by plaintiff concerning an "incident report."
Plaintiff filed a motion to produce which sought "[a]ll written reports, memoranda or notes concerning the fall of Eulyn H. Sims in the Intensive Care Unit at Knollwood Park Hospital." Defendant objected to the production, with the following response:
 "The defendant would object to the production of such reports and notes as pertaining to the investigation of this incident, these being documents which have been prepared in anticipation of litigation, and there being no showing of undue hardship on the part of the plaintiff. The remaining records of the hospital *Page 155 
as pertaining to the particular plaintiff have been produced to the attorney for the plaintiff."
Plaintiff then moved for an order for production contending she was entitled under Rule 26, A.R.Civ.P., to peruse the incident report prepared by hospital personnel concerning her fall. The trial court ordered production of the document, reviewed it in camera, denied plaintiff's motion, and ordered the document sealed. Plaintiff's motion for reconsideration of this order was denied. Subsequently, the trial court granted defendant's motion in limine prohibiting reference to the incident report during trial.
In reviewing this issue, it is important to consider that the gist of plaintiff's action was that she was allowed to fall from the chair in which hospital personnel had placed her. The following facts concerning that event illuminate plaintiff's purpose in attempting to obtain the incident report.
The nurse in charge of plaintiff at the time of her fall was Mrs. Armita Underwood, who testified as follows:
 "Q. I ask you one thing. You tied the knot, didn't you, in the chair and the sheet?
"A. Yes.
 "Q. Now, would you describe that knot? What type of knot? There are different types of knots. Did you just — regular?
"A. Regular double knot.
 "Q. Regular one? And did you pull it tight so that it won't come loose?
"A. Yes.
 "Q. Okay. Now my question is: They have constant surveillance in the ICU, correct?
"A. Yes.
 "Q. My question is: That if you tied that knot, the knot was behind her, wasn't it?
"A. Uh-huh.
 "Q. And it was a double knot and tied tight, I wonder how long it took Mrs. Sims if, in fact, she were uncomfortable to pull that all the way around, get to the knot and untie it, I wonder how long that would take? Would you have any judgment on that?
"A. I have no idea.
 "Q. Obviously, she did untie the sheet, didn't she?
"A. Apparently so.
 "Q. My question is: If she was under constant surveillance, would you have any explanation as to why somebody didn't see her untie the sheets if the knot was tight and it was brought around in front or behind or however she did it? Do you have any explanation as to why somebody didn't see her untie the sheet if she was under constant surveillance?
"A. I don't know.
"Q. Where were you when she fell?
"A. Standing at the nurse's station.
"Q. You had just come in?
"A. I had just walked in, answered the phone.
"Q. But you didn't see her fall, did you?
"A. No.
"Q. And as far as you know, nobody saw her fall?
"A. I don't know.
"Q. And nobody saw her undo the knots, did they?
"A. (No audible response.)
"Q. Did they?
"A. I don't think so."
Apparently Mrs. Underwood had testified by deposition to the same effect.
The deposition of Dr. Lozier, one of Mrs. Sims's attending physicians, varied somewhat from Mrs. Underwood's account:
 "Q. Did she [Mrs. Underwood] tell you she was there when Mrs. Sims fell?
"A. No.
"Q. She didn't tell you that or she wasn't?
"A. No. She didn't tell me that.
 "She told me that she had just left the room and, you know, couldn't catch her.
 "She just saw her getting up, trying to get up, and she tried to stop her but she couldn't get to her before she fell.
"Q. She had just left what room, you say? *Page 156 
"A. The I.C.U. room where she was a patient.
"Q. Where Mrs. Sims was?
"A. Uh-huh.
". . . .
"Q. When did you talk to her?
 "A. I talked to her on Monday after this happened on, I think, a Saturday or a Sunday.
"I talked to her on the following Monday.
 "Q. Did you make any notes of that in your records?
"A. Let's see here. I don't see any.
"Q. So you are just recalling from memory?
 "A. Yes. I am just trying — I'm recalling from memory.
 "Q. Would you normally have included that in your notes?
 "A. No, not necessarily. I just — you know, usually the nurses write an incident report up and they write up a — they put things in their notes about what happened in their own words but I didn't make any notes in my part of the records.
". . . .
 "Q. And it is your best recollection that the nurse told you that she was returning from — was she returning from Mrs. Sims' room right prior to her fall?
 "A. She was headed towards the room is what she told me.
"Q. Okay.
 "A. And saw her trying to get up but couldn't get to her in time.
 "Q. I understand. You stated earlier that the nurse told you she had just been gone from the room a short time?
 "A. Right. And she saw Mrs. Sims trying to get up and that's when she turned to go back in."
A comparison of Mrs. Underwood's testimony with that of Dr. Lozier reveals contradictory aspects which might have been either clarified, on the one hand, or accentuated on the other, by the contents of the "incident report." The "incident report" may have contained relevant information, indeed, on the merits of the case, i.e., the negligence vel non of the hospital staff.
The response of defendant's counsel to the trial court's order to produce the "incident report" is revealing in regard to the character and nature of that report. We quote from counsel's letter, which is contained in the record:
 "This document is otherwise known as an incident report, and if Your Honor will note at the bottom of this document it is shown on the face as 'Confidential-For Attorney's Use Only.' The bottom portion of the writing is actually cut off of this copy by the xerox but that is the language that is contained on the original document itself.
 "This document is prepared when an incident occurs at the hospital which might result in some legal action and it is submitted to the risk manager for review and then turned over to the legal department."
Although the hospital concluded that this document was prepared in anticipation of litigation, that conclusion, we respectfully observe, must be tested by applying the rules of discovery to the circumstances of the incident report's creation.
Rule 26(b)(1) permits discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." When it is asserted that an otherwise discoverable document was made "in anticipation of litigation," the objecting party bears the burden of proving the elements of the work-product exception of Rule 26(b)(3). Hickman v. Taylor,329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947).
A case analogous to the instant situation arose inAssured Investors Life Ins. Co. v. National Union Associates,Inc., 362 So.2d 228 (Ala. 1978). In that case, civil litigants sought to discover a transcript of a statement made by a person whose activities were being investigated by the district attorney's office. The district attorney's office opposed discovery of the document on the ground that it was the "work product" of that office. In deciding against that position, this Court stated, at 232: *Page 157 
 "The 'work product' argument is inapplicable because:
 " 'The written statement of a witness, whether prepared by him and later delivered to the attorney, or drafted by the attorney and adopted by the witness, is not properly considered the "work product" of an attorney. It records the mental impressions and observations of the witness himself and not those of the attorney.' Scourtes v. Fred W. Albrecht Grocery Co., 15 F.R.D. 55, 58 (N.D. Ohio 1953), citing, Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451
(1947).
 "Here, the mere fact that the District Attorney's office obtained this statement does not render it their work product. The transcription and recordation of the statement [were] incidental to the statement itself, which was not the product of counsel. Therefore, we are left with the sole question of whether the statement is nondiscoverable under the concept of executive privilege."
The defendant's own description of the need for such "incident reports," moreover, is revealing, for it states that "[t]his document is prepared when an incident occurs at the hospital which might result in some legal action." That is to say, while "incidents" that in someone's opinion might result in legal action may not in themselves be routine, it is the routine of the hospital to make an "incident report" when such incidents do occur.
Of course, such a speculation as to possible litigation is not enough to cloak those reports with the protection given an attorney's work product. Binks Manufacturing Co. v. NationalPresto Industries, Inc., 709 F.2d 1109, 1118-19 (7th Cir. 1983), contains relevant discussion and evaluation of that premise:[1]
"THE WORK PRODUCT PRIVILEGE
 "Presto next argues that the district court erred in allowing Binks to discover and introduce into evidence two letters dated January 21 and January 25, 1977 written by Richard Lavers, Presto's associate resident counsel. Presto asserts that the two documents are protected from disclosure under the attorney's work product privilege. The January 21 letter, entitled 'Evaluation of Binks Situation' was addressed to Presto's chief in-house counsel, while the January 25 document containing Lavers' opinion as to the allocation of responsibility for each of the System's respective breakdowns, was sent to Presto's Production Manager.
 "It is axiomatic that in order to invoke the protection of the work product privilege, one must show that the materials sought to be protected were prepared 'in anticipation of litigation. . . .' Fed.R.Civ.P. 26(b)(3). Thus, the threshold determination in any case involving an assertion of the work product privilege, including this case, is whether the materials sought to be protected from disclosure were in fact prepared in anticipation of litigation. The mere fact that litigation does eventually ensue does not, by itself, cloak materials prepared by an attorney with the protection of the work product privilege; the privilege is not that broad. Rather, as the court stated in Diversified Industries, Inc. v. Meredith, 572 F.2d 596, 604 (8th Cir. 1977):
 " '[T]he work product rule does not come into play merely because there is a remote prospect of future litigation.'
 "In 8 Wright Miller [Federal Practice 
Procedure, Civil, Section 2024] it is said:
 " '. . . Prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular *Page 158 
case, the document can fairly be said to have been prepared or obtained because of the propsect of litigation.' (Emphasis added [in Binks].)
 "Similarly, we find persuasive the court's reasoning in Janicker v. George Washington University, 94 F.R.D. 648, 650 (D.D.C. 1982):
 " 'The mere contingency that litigation may result is not determinative. If in connection with an accident or an event, a business entity in the ordinary course of business conducts an investigation for its own purposes, the resulting investigative report is produceable in civil pre-trial discovery. As stated in Soeder v. General Dynamics Corp., 90 F.R.D. 253 (D.Nev. 1980) the distinction between whether defendant's "in house" report was prepared in the ordinary course of business or was "work product" in anticipation of litigation is an important one. 90 F.R.D. at 255. The fact that a defendant anticipates the contingency of litigation resulting from an accident or event does not automatically qualify an "in house" report as work product. . . . A more or less routine investigation of a possibly resistable claim is not sufficient to immunize an investigative report developed in the ordinary course of business. Some recent cases have suggested the need for objective facts establishing an identifiable resolve to litigate prior to the investigative efforts resulting in the report before the work product doctrine becomes applicable. See e.g. Fine v. Bellefonte Underwriters Insurance Co., 91 F.R.D. 420 (S.D. N.Y. 1981); Atlanta Coca-Cola Bottling Co. v. Trans America Ins. Co., 61 F.R.D. 115 (N.D.Ga. 1972). While litigation need not be imminent, the primary motivating purpose behind the creation of a document or investigative report must be to aid in possible future litigation.'
 "The court in Coastal States Gas Corp. v. Department of Energy, 617 F.2d 854, 865 (D.C. Cir. 1980) held that the party seeking to assert the work product privilege has the burden of proving that 'at the very least some articulable claim, likely to lead to litigation, [has] arisen.' " (Emphasis added.)
That court concluded at 1120:
 "It is often difficult to determine with precision when a particular attorney's work is 'in anticipation of litigation' rather than 'an investigative report developed in the ordinary course of business.' Janicker, 94 F.R.D. at 650. We conclude though, that while there may have been 'the remote prospect of litigation' when Lavers prepared his memoranda, the appellant has failed to meet its burden of proving that the memoranda were 'prepared . . . because of the prospect of ligitation,' Diversified Industries, 572 F.2d at 604 (emphasis added [in Binks]), or, that 'some articulable claim, likely to lead to ligitation,' Coastal State Gas Corp., 617 F.2d at 865 (emphasis added [in Binks]), had arisen. Therefore, we hold that Presto failed to meet its burden of proof necessary to invoke the work product privilege for the January 21 and January 25 memoranda."
Nor does it aid the defendant that this incident report was turned over to a "risk manager" and ultimately made its way to "the legal department." In Rakus v. Erie-Lackawanna R.R.,76 F.R.D. 145 (W.D.N.Y. 1977), the incident reports prepared by a railroad supervisor and a division engineer for the railroad's claims department were held not to have been made in anticipation of litigation. "If defendants' argument were upheld," the court pithily observed, "all discovery of intercompany reports would be subject to the requirements of rule 26(b)(3) in any case where the company maintained a claims department. This position is untenable."
We conclude that this "incident report" was not a "work product" falling within the trial preparation exception of Rule 26(b)(3), A.R.Civ.P. In reaching that conclusion, we observe that in essence there was no difference in the preparation of this report and the preparation of the statements referred to in Assured Investors Life Ins. Co., supra, or the letters in *Page 159 
question in Binks Manufacturing Co., supra. See also APLCorporation v. Aetna Casualty Surety Co., 91 F.R.D. 10 (D.Md. 1980).
We are not unmindful of the broad discretionary power given to the trial court in the discovery process, as noted inCampbell v. Regal Typewriter Co., 341 So.2d 120 (Ala. 1976). The question in such cases as Regal and the instant case "becomes one of whether, under all the circumstances, the trial court has abused its discretion." Campbell, at 123. Under the circumstances of the preparation of this report, however, and the principles of law applicable thereto, we must conclude that the trial court erred in denying production of the document and subsequently granting defendant's motion in limine. That error must, and does, result in reversal of the judgment below, and this cause is remanded for a new trial.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, ALMON and HOUSTON, JJ., concur.
 On Application for Rehearing
REATTY, Justice.
OPINION MODIFIED; APPLICATION OVERRULED.
TORBERT, C.J., and MADDOX, ALMON and HOUSTON, JJ., concur.
[1] "Our Rules of Civil Procedure are based upon, and are strikingly similar to, the Federal Rules of Civil Procedure. Because these two sets of Rules are virtually verbatim, a presumption arises that cases construing the Federal Rules are authority for construction of the Alabama Rules." AssuredInvestors Life Ins. Co. v. National Union Associates, Inc.,362 So.2d 228, 231 (Ala. 1978).