643 So.2d 955 (1994)
BAPTIST MEDICAL CENTERS, BAPTIST MEDICAL CENTER MONTCLAIR
v.
James L. TRIPPE, Sr., as administrator of the Estate of Nancy Pauline Trippe, deceased.
1920768.
Supreme Court of Alabama.
July 1, 1994.
Charles E. Sharp, Joel A. Williams and Stephanie R. White of Sadler, Sullivan, Herring & Sharp, P.C., Birmingham, for appellant.
G. Whit Drake and Thomas Marshall Powell of Emond & Vines, Birmingham, for appellee.
Sydney Lavender and James C. Barton of Johnston, Barton, Proctor, Swedlaw & Naff, Birmingham, for amicus curiae Alabama Hosp. Ass'n.
PER CURIAM.
Baptist Medical Centers, Baptist Medical Center Montclair appeals from a judgment based on a $1,100,000 jury verdict in favor of James L. Trippe, Sr., as administrator of the estate of Nancy Pauline Trippe. We reverse and remand.
On November 7, 1989, Nancy Trippe was voluntarily admitted to the psychiatric unit of Baptist Medical Center Montclair ("BMC"). She had been diagnosed by her doctor, Dr. David Morrison, as suffering from "bipolar disorder with suicidal thoughts." Upon her admission to BMC, Trippe was searched by one of the nurses; however, the search did not rise to the magnitude of a "strip search." She was required to remove all clothing and put on a hospital gown. It is undisputed that no body cavity search was done. Although Dr. Morrison had reserved a less restrictive room on the psychiatric floor for Trippe, she was transferred to a more restrictive psychiatric wing when she refused to sign a "no suicide contract." Pursuant to Dr. Morrison's orders, a nurse was to personally observe Trippe every 15 minutes and Trippe was to be monitored via video in between these observations. She was to receive individual *956 and group occupational therapy, as well as recreational therapy, and she was also to be treated with antidepressants.
On November 8, Trippe made no suicidal gestures. On November 9, Dr. Morrison doubled Trippe's dosage of the sedative Elavil and, despite the fact that she voiced a "death wish" for Veterans' Day, Trippe visited with her mother for approximately two hours that afternoon. Her mother testified that during the visit Trippe seemed to be in a good mood. After her mother left, Trippe was observed, on the video monitor, standing on her bed and reaching toward the light fixture in her room. As a result of this unusual behavior, she was moved to another room. In her new room, everything was removed except the mattress. The electricity to the sockets in the room was cut off to prevent Trippe from injuring herself.
Once Trippe was placed in the room, the nurse returned to the nurse's station. There, watching the video monitor, she saw Trippe rubbing her wrists with the metal clip on her identification bracelet. Nurses went to her room and Trippe voluntarily relinquished the metal clip to them. Upon returning to their station, however, the nurses noticed on the monitor that Trippe had something in her hands; they immediately returned to Trippe's room and took from her a book of matches and a cigarette. Upon again returning to their station, the nurses observed Trippe lift up her sweater and pull something else out. They went back to the room and saw through the plexiglass that she was holding a gun to her chest. While one of the nurses called for assistance, Trippe shot and killed herself.
Her father, James L. Trippe, Sr., sued BMC and Dr. Morrison, alleging that they had negligently provided medical services to Trippe and that they had breached the standard of care for treatment of psychiatric patients.[1] Throughout the trial, BMC contended that Trippe had smuggled the gun (a derringer) into BMC by concealing it inside a body cavity. BMC argued that it did not breach the standard of care and that it could not have foreseen that Trippe would conceal such a weapon inside her vagina or rectum. In support of their argument, BMC called expert Lawden Yates, who had examined the gun at the request of the plaintiff. He stated that when he examined the derringer on February 24, 1992, it was noticeably covered with human epithelial cells secreted from a body cavity. Yates further testified that he found no evidence that the gun had been fired or cleaned before he examined it. The gun was returned to the plaintiff's attorneys, and it was given to the defendants' attorneys on March 5, 1992.
The trial court admitted Yates's testimony, but it refused to admit the testimony of BMC's expert Phylis Rolan, who examined the gun on March 16, 1992, after it had been turned over to the defendants by the plaintiff. Rolan's deposition indicates that she would have testified that upon examining the gun she found that it had been cleaned and fired. Rolan said she found no evidence of epithelial cells on the derringer. The trial judge refused to allow Rolan to testify, on the grounds that her testimony would insinuate that the lawyers for the plaintiff had cleaned the gun after their own expert had found evidence that the gun had been concealed in a body cavity. BMC, however, argues that despite whatever conclusions might be drawn from Rolan's testimony, it should have been allowed to introduce Rolan's testimony in an effort to show the jury that the gun that was received into evidence was not in the same condition as when it was examined by Yates.
"The pertinent rule is that articles or objects which relate to or tend to elucidate or explain the issues or form a part of the transaction are admissible in evidence when duly identified and shown to be in substantially the same condition as at the time of the occurrence."
Liberty National Life Insurance Co. v. Weldon, 267 Ala. 171, 100 So.2d 696, 712 (1957).
While this Court can understand the trial court's reluctance to allow opposing counsel to accuse the plaintiff's attorneys of destroying evidence, we conclude that the trial court erred in refusing to allow BMC to offer evidence tending to show that someone *957 unknown to it had cleaned the derringer after it had been examined by Yates but before it was examined by Rolan. The gun was introduced into evidence with no trace of epithelial cells; Trippe invited the jury to inspect the derringer used in the suicide; and Trippe's attorneys urged the jury to refuse to believe that Trippe had smuggled the derringer into the hospital inside a body cavity. Consequently, the jury was entitled to consider Rolan's testimony and draw conclusions therefrom, even if one of those conclusions was that someone had cleaned the derringer between the time Yates examined it and the time Rolan examined it. BMC was clearly entitled to show the jury that the derringer was not in the same condition at the trial as it was when it was when Lawden Yates examined it.
Trippe contends that any error committed in this regard was harmless because, he argues, an expert testified that a strip search should have been done on Nancy Trippe when she checked into the hospital and that such a search would have or should have found the gun. While it is not clear whether a strip search would have located a weapon concealed inside a body cavity, we need not consider whether the error in regard to Rolan's testimony was harmless, because this case must be reversed on yet another ground.
At trial, the following occurred during Trippe's examination of Nurse Goble, a witness for BMC:
"Q. Last night I was thinking over some questions that I forgot to ask you about your strip search policy back in 1989. And as I recall, you told me that it required a doctor's order before you could strip search a patient; is that correct?
"A. Yes. That's with a doctor's order.
"Q. And with respect to Dr. Morrison, you were here yesterday when we read his testimony, and he testified that a physician's order was not required in order to perform a strip search and they would not have needed, and when I say they, the nurses, would not have needed an order to search Nancy. Do you remember that testimony?
"A. Yes, sir.
"Q. You disagree with that testimony, I assume.
"A. That's not according to our policies and procedures.
"Q. Okay. In your opinion as the head nurse of the psychiatric department, and as you were in 1989, the fact that you had a strip search policy that required a physician's order, in your opinion is that the best policy available?
"A. Yes, sir.
"Q. It is?
"A. (Witness nodding head in the affirmative.)
"Q. Ma'am?
"A. Yes, sir.
"PLAINTIFF'S ATTORNEY: Judge, may I approach the bench?
"THE COURT: Yes, sir.
"PLAINTIFF'S ATTORNEY: We may need to go into your office to talk about this.
"THE COURT: All right. Ladies and gentlemen, we're kind of in an unofficial recess. I'm going to take a matter up with the attorneys back in chambers. Just stay within the courtroom or the jury room, and, hopefully, we will be back with everyone in about five minutes.
"(Hearing in Judge's chambers outside the hearing of the jury.)
"THE COURT: All right. You asked her whether in fact now that was a good policy and procedure.
"PLAINTIFF'S ATTORNEY: The procedure available. This was not the subject matter of the defendant's motion in limine. But after this incident they rewrote their strip search policies and required a strip search across the board without a physician's order. They addressed in their motion in limine, simply, the metal detectors issue; but in fairness to them and to the Court, to everybody, I wanted to make sure I brought it up outside the hearing of the jury. But Mrs. Goble has just testified in her opinion the strip search policy that was in effect at Baptist Medical Center Montclair *958 in 1989 was the best policy available. I now believe, Judge, I am entitled to go into that for two reasons, impeach the witness, and number two, to show notice to the witness that there was a different procedure available during this time. She also has testified earlier, I guess, about Hillcrest having a strip search policy mandatory. And I want to ask her since she has now stated that the policy at BMC was the best policy, I now believe I am entitled to ask her why it changed after the incident.
"DEFENDANTS' ATTORNEY 1: What if she believes this was the best policy available in 1989?
"PLAINTIFF'S ATTORNEY: Same thing. I got through talking about Hillcrest had a policy that required a strip search with or without a doctor's order in 1989, and if in your opinion in 1989 that was the best policy available then, I believe I'm entitled to the fact that the policy was changed.
"THE COURT: Kind of like a subsequent modification.
"PLAINTIFF'S ATTORNEY: Yes.
"THE COURT: In that the state of the art was better than she thinks it was long before it was the level that she says is the best.
"DEFENDANTS' ATTORNEY 1: Your Honor, no other facility in the country according to their expert, not anybody we've spoken to, are using metal detectors.
"PLAINTIFF'S ATTORNEY: We haven't gotten to that yet.
"THE COURT: We're talking about the strip search being state of the art.
"PLAINTIFF'S ATTORNEY: We haven't gotten to that yet.
"DEFENDANTS' ATTORNEY 2: May I say something?
"THE COURT: Yes.
"DEFENDANTS' ATTORNEY 2: The questionon this adverse witness, he's given broad latitude as to what he can ask, but there's no such standard as the best possible. That's not our standard. I mean, the standard is whether or not we were exercising the same degree as the standard of the community, whether or not it's a reasonable standard. It's not the best, you know. You get a lot of these malpractice cases, and there's a charge that says the health care provider isn't required to give the very best; it's just a reasonable care standard. So the question he's asked, whether or not it is the best, that is objectionable. Of course, he asked it, but that is not the standard of care. So now he's trying to impeach her on something that is not an issue in this case, whether or not it's the best, you know. There's a lot of argument as to what's the best, and we don't even have to do the best.
"THE COURT: I think [Defendants' Attorney 2] is right on that. Under the medical negligence, medical liability act, as far as what's the best, they don't have to offer the best.
"PLAINTIFF'S ATTORNEY: No, sir, Judge. And that's exactly what I'm saying. In 1979 when she worked at Hillcrest and had notice of the fact that they had a policy that required strip searches across the board and allowed them to do that [without] the physician's order ten years before the incident, and now she's turning around and telling me on the stand today that at the time of this incident in 1989 she feels that the policy that required a physician's order was the best policy. And then immediately after this incident she's initiated a policy that was in effect in 1979 at Hillcrest, and I think it's admissible on those two exceptions.
"THE COURT: Well, what I'm saying is this: I think if the question is asked correctly where you don't run afoul of the objection [Defendants' Attorney 2] has made as to what is the best possible procedure, I think if the question is asked in such a way and she steps into the trap in such a way and answers this was, you know, medically sound, medically prudent, it was as good as could be gotten in the community, something like that, as far as the way they were searching in '89, and you portray them to her *959 what she was used to in '79, I think through impeachment you could get in. But I think the question has to be reasked and answered in such a way to impeach her.
"DEFENDANTS' ATTORNEY 2: Your Honor, you're giving him ideas. You said good as can be. Naturally, there are many ways a person can say it. You are not charged with good as anything. We are only charged with a reasonable standard of care to provide the standard.
"THE COURT: Yes, you're right.
"DEFENDANTS' ATTORNEY 2: In the community. So I don't know how that's going to work out with what he's trying to do.
"THE COURT: I understand. If he asked the question rightIf you ask it and not run afoul of his objection, then as far as that being grounds for impeachment as long as you don't, can't get into the subsequent remedial measure I think it is a valid exception.
"PLAINTIFF'S ATTORNEY: Well, I thought I had already done that with the questions I had asked and especially when she said it was the best. There's a case, I guess, if I could pull it for you
"THE COURT: Is it medical?
"PLAINTIFF'S ATTORNEY:where a witness testifies that this system was either the best or the safest, and I believe that's Blythe versus Sears.

"THE COURT: It's a medical negligence case?
"PLAINTIFF'S ATTORNEY: That's the standard they are held to, what is the reasonable practice of medicine in the community.
"DEFENDANTS' ATTORNEY 2: Thank you.
"(Jury present.)
"DIRECT EXAMINATION, continued BY PLAINTIFF'S ATTORNEY:
"Q. I apologize, Mrs. Goble. I was getting back to asking you a question. You had just testified that in your opinion the strip search policy that was in effect at Baptist Medical Center in 1989 was the best possible policy; is that correct?
"DEFENDANTS' ATTORNEY 2: Judge, I would object to that because our standard is not the best. It's the reasonable standard in the community, and I would object to any further mentioning of that standard.
"THE COURT: Well, I think he was asking her whether or not that was the question that he had asked her, if she remembered that, and so I will allow that question.
"A. Yes.
"Q. Did the strip search policy that was in effect at Baptist Medical Center Montclair in 1989 meet the reasonable standard in the medical community for the treatment of psychiatric patients?
"A. In my opinion, it did.
"Q. And the policy at Hillcrest that was in effect in 1979, which allowed strip search of patients without a physician's order, in your opinion, did that policy meet the reasonable standard of care in the medical community?
"A. It was the standard of care at Hillcrest.
"Q. In your opinion, which policy was better?
"DEFENDANTS' ATTORNEY 2: Judge, I'm going to object to that because they are both reasonable standards of care. It doesn't make any difference which one was the best, so I'll object to that.
"THE COURT: Okay. Overruled.
"Q. You can answer.
"A. Which was best?
"Q. Yes, ma'am.
"A. I don't know that I have a preference for which was best. When I worked at Hillcrest, I followed their policy and procedure, and I did so at Baptist.
"Q. In your opinion, the policy that was in effect in 1989, as it was at BMC as you said earlier, was the best policy available at that time?
"A. Yes.
"Q. In your opinion, is it safer to allow psychiatric nurses a judgment call on when to strip search a patient?

*960 "DEFENDANTS' ATTORNEY 2: Judge, I'll object to that question as it incorporates the standard of care. Is it the safest?
"THE COURT: I don't think it's safest. I think it's safer.
"DEFENDANTS' ATTORNEY 2: Oh, safer.
"PLAINTIFF'S ATTORNEY: Yes, safer.
"DEFENDANTS' ATTORNEY 2: Oh, well, I don't hear too good. I'll object to that, too, the safer. As long as they both provide reasonable care, then I object to which is safer of the two reasonable cares.
"THE COURT: Okay. At this point in time I don't know, you know, and I think it's yet to be proven what is the standard of reasonable care. So as to what her answer is to what is safe and safer, I can't rule. I don't know the answer. So I'm going to overrule and allow her to answer the question.
"Q. Yes, ma'am.
"A. Would you ask it again?
"Q. Yes, ma'am. In your opinion, would it be safer to give a psychiatric nurse the liberty to strip search a patient without a doctor's approval, without a doctor's order, than to require the nurse to get a doctor's order before doing that?
"DEFENDANTS' ATTORNEY 2: Same objection, Judge. Same ruling?
"THE COURT: Overruled.
"A. Well, I don't know that I have thought honestly in terms of which would be safer, because as I said, when Iwhen I work for an institute, I follow their policies and procedures. And the policies and procedures should reflect a standard of care that is adequate to provide good patient care. And our policies and procedures are reviewed by the Commission for Hospital Accreditation and are found to be adequate.
"Now, I don't have a personal opinion on which is safer and that's my honest answer.
"Q. You, as the head nurse of the psychiatric department of Baptist Medical Center, just don't know one way or the other which is the better policy? Is that what you're telling me here?
"A. No, that's not what I'm saying.
"DEFENDANTS' ATTORNEY 2: Judge, he's arguing with the lady. She's answered and said she just doesn't know. She's answered the question, and he in a very nice way is arguing with the lady.
"THE COURT: Overruled.
"Q. You can answer. You can answer my question.
"A. I said, no, I didn't sayI'm notI'm confused now. I don't even remember your last question.
"Q. My last question to you, ma'am, was, "You just don't know one way or the other which is the better policy? Is that what you're telling me?'
"A. I'm saying I don't have an opinion as to which is a better policy.
"Q. Of course, you
"A. We work
"Q. Go ahead. I'm sorry.
"A. Weto my knowledge, we didn't have any problems with either of the policies at Baptist nor at Hillcrest in my personal experience.
"Q. You don't feel that Nancy Trippe's deathand I'm not being argumentative with youbut you don't feel that Nancy Trippe's death was a problem?
"DEFENDANTS' ATTORNEY 2: Now, Judge, I'm going to object to that.
"THE COURT: Sustained.
"Q. Let me ask you this. You said that you just don't know one way or the other. You, of course, participated actively in writing the policies and procedures for the psychiatric department at BMC, did you not?
"A. Yes, I did.
"Q. And you still sit [in] that capacity today, do you not?
"A. Yes, I do.
"Q. Are you familiar with the standard of care with respect to strip searches as it is today?

*961 "A. Yes, I am.
"Q. Is it any different today
"A. No.
"Q. than it was in 1989?
"DEFENDANTS' ATTORNEY 2: Wait a minute. Judge, I'm going to object to anything after the accident as it not being an issue in this case.
"(Bench conference outside the hearing of the jury.)
"PLAINTIFF'S ATTORNEY: Judge, I asked her if she had an opinion as to which is safer and she said she had no opinion. That goes directly to her credibility in the fact that she changed the policies after this incident. I mean, that is directly on point. Back in 1979, she knew of a different policy and she changed it.
"THE COURT: This is the same thing we discussed in chambers so I'm going to overrule and allow this in.
"DEFENDANTS' ATTORNEY 2: May I get all the objections on the record if you want to agree that it's the same as it was back there; but I don't think it is, because it's now gone off on a different tack. Now, it's for what he terms as impeachment and I don't
"THE COURT: That's what we discussed back there, the two prongs of it.
"DEFENDANTS' ATTORNEY 2: Okay. I didn't get the second prong. All right.
"THE COURT: I've gotten them written down right here what we discussed back there.
"DEFENDANTS' ATTORNEY 2: All right. Well, may I just state that I do object on the basis that it's getting into what we call a subsequent remedial change and the guides for impeachment, which I actually objected to the question that he was asking. So I take exception to Your Honor's ruling.
"THE COURT: All right, sir. All right.
"DEFENDANTS' ATTORNEY 2: And Judge, may I have, you know, he's going to go into this to a great length, may I have a continuing objection instead of having to jump up every time?
"THE COURT: You have properly noticed and we will observe a continuing objection.
"DEFENDANTS' ATTORNEY 2: Thank you. Even though I will ask her some questions on it myself, which are now gone into, but I'm not opening any doors.
"THE COURT: You're not opening any doors or waiving any objection.
"DEFENDANTS' ATTORNEY 2: Thank you, Your Honor.
"Q. What is that standard of care today at Baptist Medical Center?
"A. In regards to the strip search?
"Q. Yes, ma'am.
"A. A strip search is performed with a device, which we call a Garrett's Super Scanner Device.
"Q. I was just asking you, ma'am, about the strip search, the physical strip search of patients. And let me ask it to you this way.
"After Nancy Trippe's death, Baptist Medical Center across the board now requires strip searching of all patients that go in the psychiatric unit; is that correct?
"A. That's correct.
"Q. And that's with or without a doctor's order; is that correct?
"A. Yes, sir.
"Q. And Baptist Medical Center also requires strip searching of psychiatric patients by the nurses when they perceive a situation that could be dangerous at any time with or without a doctor's order; is that correct?
"A. That's correct.
"Q. Just like Hillcrest did in 1979?
"A. That's correct."
On appeal, BMC contends that the trial court erred in admitting evidence offered by Trippe of subsequent remedial measures, specifically, BMC's change in policy following Trippe's suicide to allow routine strip searches of psychiatric patients. Trippe contends that he was entitled to impeach Nurse Goble's testimony that the procedure in place at the time of the suicide was *962 the "best" procedure available, based on an exception to the rule regarding subsequent remedial measures; however, it is clear from the record that the testimony violated that rule and that the impeachment exception thereto was not applicable in this instance.
This Court wrote in Phar-Mor, Inc. v. Goff, 594 So.2d 1213 (Ala.1992):
"The general rule excluding evidence of subsequent remedial measures is that `evidence of repairs or alterations made, or precautions taken, by the defendant after the injury to the plaintiff in an accident is not admissible as tending to show the defendant's antecedent negligence [or culpable conduct].' Charles W. Gamble, McElroy's Alabama Evidences, § 189.02(1) (4th ed. 1991) (citing Macon County Comm'n v. Sanders, 555 So.2d 1054 (Ala.1990); Hyde v. Wages, 454 So.2d 926 (Ala.1984); Banner Welders, Inc. v. Knighton, 425 So.2d 441 (Ala.1982)). Under the rule, subsequent remedial measures have been excluded on two grounds: (1) that evidence of a subsequent repair or change was irrelevant to show antecedent negligence, see Hart v. Lancashire & Yorkshire Ry., 21 L.T.R. 261, 263 (1869), cited in Comment, The Impeachment Exception to Rule 407: Limitations on the Introduction of Evidence of Subsequent Measure, 42 U.Miami L.Rev. 901, 903 (1988); see also Proposed Rules of Evidence, 46 F.R.D. 161, 236 (1969); and (2) that public policy favored promoting safety by removing the disincentive to repair, see Alabama Power Co. v. Marine Builders, Inc., 475 So.2d 168, 171-72 (Ala.1985); see also Probus v. K-Mart, Inc., Inc., 794 F.2d 1207, 1210 (7th Cir.1986). Even though the rule was established to exclude evidence of subsequent remedial repairs or alterations, evidence of such repairs or alterations can be introduced for certain purposes other than proving antecedent negligence or culpable conduct:
"`Evidence of subsequent remedial repairs... may be admissible to show identity of ownership, to show control of the locus, to contradict or impeach a witness, or to lessen the weight of an expert opinion. Norwood Clinic, Inc. v. Spann, 240 Ala. 427, 199 So. 840 (1941). Another permissible use may occur where such evidence is offered to establish a condition existing at the time of the accident. Leeth v. Roberts, 295 Ala. 27, 322 So.2d 679 (1975).'"
"Holland v. First National Bank of Brewton, 519 So.2d 460, 462 (Ala.1987) (quoting Banner Welders, Inc. v. Knighton, 425 So.2d 441, 444-45 (Ala.1982)).
"In Holland, this Court established a three-factor test for the admissibility of evidence of subsequent remedial measures offered for `other purposes':
"`The admissibility of evidence of subsequent remedial measures offered for these `other purposes' depends on three factors: (1) whether the `other purposes' are material; that is, at issue in the case; (2) whether they are relevant to the issue, that is, whether the evidence tends to prove the purpose for which it is offered; and (3) whether the probative value of the evidence is substantially outweighed by its prejudicial effect. The burden is on the party seeking to admit evidence of subsequent remedial measures to establish materiality, relevancy, and probative value in excess of prejudicial effect.'
"Id. at 462 (citing Charles W. Gamble and Gwen L. Windle, Remedial Measures Doctrine in Alabama: From Exclusion to Admissibility and the Death of Policy, 37 Ala.L.Rev. 547 (1986))." [Emphasis in Holland.]
594 So.2d at 1216.
The Court wrote further in Phar-Mor:
"This Court recently stated in Blythe v. Sears, Roebuck & Co., 586 So.2d 861 (Ala. 1991), that the trial court must apply the impeachment exception with care so that the exception does not swallow the rule. In so holding, we established that in order to impeach the credibility of a witness through the introduction of a subsequent remedial measure, the testimony providing grounds for impeachment must have been initiated by the witness. Id.

"The impeachment exception to the exclusionary rule was created to prevent a defendant from gaining an unfair advantage *963 from self-serving, false, or misleading statements that would go unchallenged under the exclusionary rule. Id. Because the exception arose in order to protect a plaintiff from an aggressive defendant attempting to manipulate the exclusionary nature of the rule for his own advantage, it follows that a plaintiff who is on the offensive should not be allowed to manipulate the impeachment exception in order to introduce evidence for purposes otherwise inadmissible. In such a situation, the defendant is in greater need of protection than the plaintiff who is seeking to prove the defendant's negligence under the guise of impeachment."
594 So.2d at 1219.
For the foregoing reasons, the judgment is reversed and the cause is remanded for a new trial.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, SHORES, STEAGALL, KENNEDY, INGRAM and COOK, JJ., concur.
HOUSTON, J., concurs specially.
HOUSTON, Justice (concurring specially).
After Ms. Trippe's apparent suicide, but on the same night, George Ruff, BMC's "in-house" counsel and vice-president, came to the hospital and obtained statements from witnesses, because, based upon his 21 years' experience as a lawyer, he believed that a wrongful death action was likely; the statements, he felt, would be needed to prepare for such an action. In Sims v. Knollwood Park Hospital, 511 So.2d 154, 156 (Ala.1987), this Court held that a court must look at the "circumstances of the incident report's creation" when it is presented with an issue involving a right to discover. In Sims, a risk manager prepared a routine report, a copy of which would ultimately be sent to lawyers, although the report was not prepared at their request. The circumstances of the preparation of the statement in this case distinguished this statement from the one in Sims. Therefore, in preparation for a new trial, the plaintiff must meet the requirements of Rule 26(b)(3), A.R.Civ.P., in order to compel production of the statements obtained by Ruff on the night of Ms. Trippe's death.
NOTES
[1] Dr. Morrison has settled with the plaintiff and is not a party to this appeal.