INGRAM, Justice.
Plaintiffs appeal from a judgment based on a jury verdict in favor of the defendants, CSX Transportation, Inc., and Mobile County. The action was based on the collision of a CSX train with a van owned by Elijah *1389 Sanders. The van was occupied by eight people.
Early in the afternoon of May 1, 1992, 20-year-old Talmadge Sprivey and his 22-year-old cousin Elijah Sanders were riding in Sanders’s van. They stopped at a store to purchase beer. After leaving the store, they saw 18-year-old Edward Murry walking along the road. They stopped for Murry to get into the van. Murry began drinking, along with Sprivey and Sanders. The three proceeded to Ethel Nettles’s home. Fifteen-year-old Vermonkida McNeal, 10-year-old Kimberly McNeal, 18-year-old Sharon Peoples,[1] 14-year-old Sylvester McCall, and 15-year-old Rachel Moseley were at Ms. Nettles’s home. The group of young people gathered in the front yard around the van, listening to the radio. Around 6:00 or 7:00 p.m., Talmadge Sprivey, Sharon Peoples, Edward Murry, and Elijah Sanders rode to a store to purchase more beer. After these four returned to the Nettles home, some of the young people, including Murry, continued to drink. Around 10:30 p.m. that evening, the group decided to go to a fast food restaurant. Everyone got into the van, which had only two seats in the front. Edward Murry got into the driver’s seat, and Vermonkida McNeal got into the passenger seat. The others got into the back of the van, some sitting in folding-type chairs. Kimberly McNeal was seated in the back of the van on a milk crate.
As they drove down Fernland Road, they approached a railroad crossing. There was a painted railroad warning sign on the roadway near the crossing. The pavement warning sign was somewhat obscured by loose dirt. At the crossing there was a standard cross-buck (an X-shaped railroad warning sign) and also a “stop” sign just before the railroad tracks. Some bushes and trees were growing to the right of the railroad tracks. At trial the testimony conflicted as to whether Murry stopped at the crossing before proceeding across the tracks. A train was approaching the crossing; the engineer was unable to stop the train. It struck the van, killing Kimberly McNeal and injuring the other passengers.
Mary Peoples (the mother of Kimberly McNeal and of two other passengers) and the remaining passengers sued CSX and Mobile County under various theories, including negligence. The jury returned a verdict in favor of CSX and Mobile County on all counts. Six of the plaintiffs (hereinafter referred to as “Peoples”) appealed.
Peoples first argues that the trial court erred in refusing to admit certain photographs of the railroad crossing; Peoples contends that these photographs showed evidence of maintenance performed, rather than “subsequent remedial measures.” Those photographs had been taken at various times after the accident. Peoples contended that the photographs previously introduced by CSX and Mobile County did not accurately depict the scene of the accident at the time of the collision. According to Peoples, the photographs she wanted to introduce showed no significant changes made at the crossing other than the “trimming of vegetation along the railroad right-of-way” and the “repainting of road markings.” Peoples contends that these were “maintenance activities” and “did not alter the essential character of the crossing because the vegetation could — and did— grow back and ... the roadmarkings could— and did — fade again.” However, CSX and Mobile County contended that Peoples’s photographs indicated substantial changes to the railroad crossing and did not an accurately depict the scene at the time of the accident. CSX and Mobile County further contended that the changes were subsequent remedial measures and that the photographs showing them were therefore inadmissible.
In her second argument to the trial court for admission of these photographs, Peoples contended, contrary to her first argument, that the photographs were evidence of subsequent remedial measures but were admissible to impeach the testimony of the county engineer, who had testified that the railroad crossing was “safe.” The trial court rejected both arguments and refused to admit the photographs.
*1390 This Court noted in Phar-Mor, Inc. v. Goff, 594 So.2d 1213 (Ala.1992), that rulings on the admissibility of evidence rest largely within the discretion of the trial court. Such rulings will not be disturbed on appeal in the absence of an abuse of discretion.
The general rule excluding evidence of subsequent remedial measures is that “evidence of repairs or alterations made, or precautions taken, by the defendant after the injury to the plaintiff in an accident [are] not admissible as tending to show the defendant’s antecedent negligence [or culpable conduct].” Goff at 1216 (quoting C. Gamble, McElroy’s Alabama Evidence § 189.02(1) (4th ed.1991)). “Under the rule, subsequent remedial measures have been excluded on two grounds: (1) that evidence of a subsequent repair or change was irrelevant to show antecedent negligence; and (2) that public policy favored promoting safety by removing the disincentive to repair.” Goff, 594 So.2d at 1216. As noted in Goff, even though the rule was established to exclude evidence of subsequent remedial repairs or alterations, evidence of such repairs or alterations can be introduced for certain purposes other than proving antecedent negligence or culpable conduct:
“[1] “[E]vidence of subsequent remedial repairs ... may be admissible to show identity of ownership, to show control of the locus, to contradict or impeach a witness, or to lessen the weight of an expert opinion. Norwood Clinic, Inc. v. Spann, 240 Ala. 427, 199 So. 840 (1941). Another permissible use may occur where such evidence is offered to establish a condition existing at the time of the accident. Leeth v. Roberts, 295 Ala. 27, 322 So.2d 679 (1975).” ’ ”
Goff, at 1216 (quoting Holland v. First National Bank of Brewton, 519 So.2d 460, 462 (Ala.1987), quoting Banner Welders, Inc. v. Knighton, 425 So.2d 441, 444-45 (Ala.1982)).
As further noted in Goff, again quoting Holland v. First National Bank of Brewton, this Court has “established a three-factor test for the admissibility of evidence of subsequent remedial measures offered for ‘other purposes’ ”:
“ ‘The admissibility of evidence of subsequent remedial measures offered for these ‘other purposes’ depends on three factors: (1) whether the ‘other purposes’ are material; that is, at issue in the case; (2) whether they are relevant to the issue, that is, whether the evidence tends to prove the purpose for which it is offered; and (3) whether the probative value of the evidence is substantially outweighed by its prejudicial effect. The burden is on the party seeking to admit evidence of subsequent remedial measures to establish materiality, relevancy, and probative value in excess of prejudicial effect.’ ”
Goff, at 1216 (quoting Holland, which cited Gamble and Windle, Remedial Measures Doctrine in Alabama: From Exclusion to Admissibility and the Death of Policy, 37 Ala. L.Rev. 547 (1986)).
With respect to the impeachment exception to the subsequent remedial measures doctrine, this Court stated in Blythe v. Sears, Roebuck & Co., 586 So.2d 861 (Ala.1991), that the trial court must apply that exception with care, so that the exception does not swallow the rule. In order for a party to be allowed to impeach the credibility of a witness by introducing evidence of a subsequent remedial measure, the testimony providing grounds for impeachment must have been initiated by the witness whose credibility is to be impeached. This is necessary because the exception arose in order to protect a plaintiff from an aggressive defendant attempting to manipulate the exclusionary nature of the rule for his own advantage. It follows, then, that a plaintiff who is on the offensive should not be allowed to manipulate the impeachment exception in order to introduce evidence for impermissible purposes. As stated in Blythe, the defendant is in greater need of protection than the plaintiff who is seeking to prove the defendant’s negligence under the guise of impeachment.
The record reflects numerous discussions between the trial court and counsel for Peoples regarding the subsequent remedial measures doctrine:
“MR. TIPLER: The Spriveys had a photographer go out there by the name of Mr. *1391 Dortch, and I think some of his photographs have been offered into evidence. And that was like within a month of the accident. This had been repainted. And what we’re—
“THE COURT: What’s the point?
“MR. TIPLER: The point is that we have to be able — we need to be able to tell the jury that the one difference, the difference in the conditions as seen in that photograph and seen — and how they were on the occasion in question is — that was added or repainted.
“THE COURT: That’s a remedial measure. Isn’t that what we were talking about?
“MR. TIPLER: Yes, sir.
[[Image here]]
“MR. TIPLER: And the pictures show, Your Honor, that they did. And this is before — again, the photographs we’re being limited to using are the photographs that the railroad took at the vantage points they wanted to take them from the morning after this incident.
“Before these Plaintiffs could even get out of the hospital, before we were hired, the County went out and made this change where they put pavement — painted down advance pavement marking symbols for railroad on the road. And then at some point after we got that first set of photographs, but shortly thereafter, there was some clearing done on the hillside.
“I would submit that the fact that they put down this new advance pavement marking symbol for railroad, as he referred to it, on the pavement right there in front of the crossing goes to impeach his testimony that it just needs to be swept off or it’s somewhat obscured. It goes to show that it needs to be repainted and repainted clearly. Yes, there’s dirt out there, but what’s happened is this stuff is just — you can see from our photographs, I think, that what’s happened is it’s just worn off. Yes, it’s partly covered by dirt, but it’s worn off, and it needed to be repainted and it should have been repainted before this occurred, and this would give the driver a clear indication of where to stop.
“If they’re going to try to use, which we say is in violation of the standards, if they’re going to try to use the front part of the advance pavement marking symbol for railroads as a stop bar—
“THE COURT: I understand what your argument is, and if there’s an objection, it’s sustained. I’m not going to allow any remedial measures in the lawsuit. What do I have to do to get your attention, huh?
[[Image here]]
“MR. TIPLER: ... [TJhere are a number of exceptions, and one of the exceptions here becomes impeachment as to what is and is not needed out there. I think the fact that the County put it out there after this occurred goes to show that it was needed....
“THE COURT: If the courts allowed into evidence subsequent remedial measures, then a lot more people would be injured—
[[Image here]]
“MR. TIPLER: ... In fact, Mr. Ruffer was testifying, in essence, that that’s not necessary, that that doesn’t make it safer or safe, that it’s just as safe the way it was. And we, in fact, have photographs, we have evidence that the railroad markings have been moved back to where Mr. Burnham actually suggests they should be, they’re supposed to be to properly mark and sign this crossing.
“We have evidence that the County has actually been out there and graded not in their — not necessarily just on their easement, but actually on what would be railroad right-of-way, they have cleared out there and cut down that hillside just like Mr. Burnham suggested should be to make this crossing what it needs to be to be safe.
“But, most importantly, they have actually put the stop bar four feet forward of where it was the night in question....
“THE COURT: Mr. Tipler, in your opinion, does that make the intersection or a crossing more safe for the people of Mobile County?
“MR. TIPLER: Does what make it more safe?
*1392 “THE COURT: The moving of the stop bar.
“MR. TIPLER: There’s no question that it does, Judge.
“THE COURT: That’s the reason it’s not coming in.
[[Image here]]
“THE COURT: Sure, it’s relevant. It’s relevant. And if it was not a subsequent corrective measure, it would be introduced in evidence. But the safety factor in all of these cases [mandates that] you do not allow into evidence subsequent corrective measures. It overrides the relevance here and the probative value that this would have. It just does, and that’s my belief.”
As previously noted, Peoples first argues that the subsequent changes were only maintenance activities rather than subsequent remedial measures. On the other hand, Peoples argues that the changes were subsequent remedial measures but were admissible to impeach the county engineer’s testimony that the railroad crossing was safe. Obviously, Peoples cannot have it both ways. Either trimming the vegetation and bushes and repainting the road markings made the condition safer or it did not. If the subsequent change made the condition safer, then that subsequent change cannot be used to prove that the condition was unsafe before. This is the basic exclusionary rule, which excludes evidence of subsequent remedial measures except for a qualified purpose.
We cannot say that the trial court abused its discretion in excluding the photographs Peoples offered. We are satisfied that Peoples offered these photographs to prove prior negligence on the part of CSX and Mobile County and therefore that they came under the provisions of the rule; consequently, we must reject Peoples’s arguments on this issue.
Peoples’s final argument is that the trial court prejudiced the jury against the plaintiffs during the presentation of their case by using “hurrying tactics” and displaying “hostility” toward them, while giving the defendants “deferential treatment.” We find no merit in this argument.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
HOOPER, C.J., and ALMON, HOUSTON, and BUTTS, JJ., concur.

. Mary Peoples is the mother of Vermonkida McNeal, Kimberly McNeal, and Sharon Peoples. She filed this action individually and as adminis-tratrix of Kimberly McNeal's estate.